590 A.2d 191

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, AND ALLSTATE INSURANCE COMPANY, INTERVENOR–RESPONDENT AND CROSS–APPELLANT, AND LIBERTY MUTUAL INSURANCE COMPANY, INTERVENOR–RESPONDENT AND CROSS–APPELLANT, v. THE STATE OF NEW JERSEY; SAMUEL FORTUNATO, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF INSURANCE OF THE STATE OF NEW JERSEY; ROBERT J. DEL TUFO, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF NEW JERSEY; DOUGLAS BERMAN, IN HIS OFFICIAL CAPACITY AS TREASURER

OF THE STATE OF NEW JERSEY; AND BENJAMIN J. RED-
MOND, IN HIS OFFICIAL CAPACITY AS THE ACTING DI-
RECTOR OF THE DIVISION OF TAXATION OF THE STATE OF
NEW JERSEY, DEFENDANTS–APPELLANTS AND CROSS–RE-
SPONDENTS, AND THE PROPERTY LIABILITY INSURANCE
GUARANTY ASSOCIATION, DEFENDANT–RESPONDENT.

Argued January 15, 1991—Decided May 16, 1991.

34

*Douglas S. Eakeley,* Acting Attorney General of New Jersey, argued the cause for appellants and cross-respondents State of New Jersey, Samuel Fortunato, Robert J. Del Tufo, Douglas Berman, and Benjamin J. Redmond (*Douglas S. Eakeley,* attorney; *Jack M. Sabatino,* Assistant Attorney General, of counsel; *Joseph L. Yannotti, Lori L. Chewkanes, Sharon M. Hallanan, Stephen P. Tasy, Sarah T. Darrow, Bernard M. Flynn, Todd A. Widger, and John M. Armstrong,* Deputy Attorneys General, on the briefs).

*Thomas P. Weidner* argued the cause for respondent and cross-appellant State Farm Mutual Automobile Insurance Company (*Jamieson, Moore, Peskin & Spicer,* attorneys; *Thomas P. Weidner, Deborah T. Poritz* and *Richard J. Wertheimer,* a member of the District of Columbia bar, of counsel; *Thomas P. Weidner, Deborah T. Poritz, Richard J. Wertheimer,* and *Murray R. Garnick,* a member of the District of Columbia bar, on the briefs).

*Floyd Abrams,* a member of the New York bar, argued the cause for intervenor-respondent and cross-appellant Allstate Insurance Company (*Smith, Stratton, Wise, Heher & Brennan,* attorneys; *Floyd Abrams, William J. Brennan, III,* and

*Wendy L. Mager,* of counsel; *Floyd Abrams* and *William J. Brennan, III,* on the briefs).

*J. Michael Riordan* argued the cause for respondent Property Liability Insurance Guaranty Association (*Bressler, Amery & Ross,* attorneys).

*Elmer M. Matthews* argued the cause for *amicus curiae* American Insurance Association (*Clapp & Eisenberg,* attorneys; *Elmer M. Matthews, Frederic S. Kessler,* and *Harvey C. Kaish,* on the brief).

*Stephen D. Cuyler* submitted a letter memorandum on behalf of intervenor-respondent and cross-appellant Liberty Mutual Insurance Company (*Cuyler, Burk & Matthews,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

This appeal arises from three actions filed by automobile insurance companies in the Superior Court, Chancery Division, all challenging the facial constitutionality of the Fair Automobile Insurance Reform Act of 1990, *L.* 1990, *c.* 8 (the Reform Act or the Act). State Farm Mutual Automobile Insurance Company (State Farm) and Liberty Mutual Insurance Company (Liberty Mutual) contend that certain surtaxes and assessments imposed by the Reform Act deny insurers any possibility of a reasonable rate of return and are a taking without just compensation and a violation of due process. Allstate Insurance Company (Allstate), as well as State Farm and Liberty Mutual, claims that the Act is an impairment of contracts because it compels insurers to pay the accumulated debt attributable to the State's prior system for insuring high-risk drivers. Other constitutional claims are that the Act is intentional punitive legislation against insurance companies; that the surtaxes and assessments exact an extraterritorial tax because a mutual insurer's New Jersey business will operate at a loss and revenues from operations in other states will subsidize New Jersey rates; that the Act's "producer assignment program" violates

due process because it compels insurers either to accept liabilities they did not incur, or to forfeit their right to do business in New Jersey; and that the Act's requirements that rates in New Jersey be based on an insurer's nationwide profitability violate the Commerce Clause of the United States Constitution.

On May 8, 1990, State Farm filed its complaint in the Chancery Division, Mercer County. Allstate and Liberty Mutual began their challenges in federal rather than state court; however, both federal actions were dismissed on jurisdictional grounds. Allstate and Liberty Mutual then filed actions in the Chancery Division in July and November 1990, respectively.

In what has become the main action on appeal, *State Farm Mutual Automobile Insurance Company v. State*, State Farm moved for a preliminary injunction, requesting relief from payments to be made to the State under the Act. In deciding that motion, the court focused on the issues of impairment of contracts and taking without just compensation. The court determined that the two questions were interrelated, in that State Farm would have to prove it was precluded from earning a fair rate of return to show that its contractual expectations had been substantially impaired. The court concluded that the Act's provisions for collecting payments from insurers to cover obligations arising under the prior system of automobile insurance regulation is a valid regulatory scheme, as long as it does not result in losses that would be an unconstitutional taking or a violation of due process. Examining in detail the Reform Act's provisions for additional surtaxes and assessments on insurers, the court also determined that while the Act, on its face, prohibited any form of offsetting rate relief for the surtaxes, it did not necessarily prohibit rate relief for the assessments. The court ruled that State Farm was entitled to a hearing to determine whether it could obtain a fair rate of return through rate-increase applications notwithstanding the exclusion of the surtax from the expense base in a rate filing. The court also granted a preliminary injunction, authorizing

State Farm to make its statutory payments into court rather than to the State.

The State immediately moved before the Appellate Division for leave to appeal and for a stay of the Chancery Division's preliminary injunction. The stay was granted and on the following day State Farm applied to this Court to vacate the Appellate Division's stay. That application was denied, leaving the stay in effect. In July, the Appellate Division granted the State's motion for leave to appeal. Thereafter Allstate, then proceeding in the Chancery Division after its federal court action had been dismissed, successfully moved before the Appellate Division to intervene in the *State Farm* appeal.

State Farm then filed a motion for direct certification, which this Court granted in November 1990. While that motion was pending, Liberty Mutual, which, like Allstate, had had its federal court complaint dismissed without prejudice, simultaneously filed a complaint in the Chancery Division and successfully moved before this Court to intervene in the *State Farm* appeal. Thus, the claims of the insurers are pursued here by plaintiff State Farm and intervenors Allstate and Liberty Mutual; in addition, the American Insurance Association has participated as an *amicus* throughout the *State Farm* litigation.

## I.

For years, New Jersey's system of automobile insurance regulation, like those of many other states, has faced an intractable problem of providing coverage for high-risk drivers. Prior to 1983, drivers who could not obtain coverage directly from insurers in the voluntary market were insured through an Assigned Risk Plan (*N.J.S.A.* 17:29D–1), under which the Commissioner of Insurance apportioned high-risk drivers among all auto insurers doing business in New Jersey. In 1983, the Automobile Full Insurance Availability Act, *N.J.S.A.* 17:30E–1 through –24, replaced the assigned-risk system with the New Jersey Automobile Full Insurance Underwriting Association,

commonly known as the Joint Underwriting Association or JUA.

All insurers licensed to write automobile insurance in New Jersey were required to be members of the JUA. The objective of the new scheme was to create a more extensive system of allocating high-risk drivers to carriers, and through the JUA, to provide such drivers with coverage at rates equivalent to those charged in the voluntary market. Originally, the JUA was governed by a board of directors, a majority of whom were representatives of insurers and insurance producers (*i.e.*, agents and brokers). The board was to adopt a Plan of Operation to carry out the JUA's objectives. Even though the board had primary responsibility for management of the JUA, the Commissioner retained plenary powers to veto actions of the board or to countermand board decisions that might not be consonant with the State's regulatory scheme.

The JUA, a good deal more complex than the prior Assigned Risk Plan, worked as follows. Insurers (and subsequently certain qualified non-insurer entities) could apply to become "servicing carriers," which would bear administrative responsibility for collecting premiums, arranging coverage, and the like, and which would receive fees for such services from the JUA. However, the statute, the Plan of Operation, and the agreements between the JUA and servicing carriers all provided that claims and liabilities of the JUA would be borne by it independently; servicing carriers were to be insulated from such claims and liabilities. See, *e.g.*, *N.J.S.A.* 17:30E–7(e); JUA Plan of Operation, dated January 23, 1989, Article V, Paragraph 3; Servicing Carrier Contract between JUA and State Farm, dated October 27, 1983, Article V, Section 5.2.

Because the JUA insured high-risk drivers but also required that their rates be the same as voluntary-market rates (see *N.J.S.A.* 17:30E–13), it was anticipated that premium revenues would not cover costs of claims against JUA policies. Therefore, in addition to normal premium income, the JUA was also

given income from Department of Motor Vehicle surcharges for moving violations and drunken driving convictions, policy "flat charges," and "residual market equalization charges," or RMECs, to be added to policy rates for voluntary-market insureds. *N.J.S.A.* 17:30E–8. Thus, the JUA was a system in which the insurance costs of high-risk drivers were subsidized by the imposition of fees on segments of the general population of motorists. The JUA was supposed to be operated on a no-profit, no-loss basis, with RMECs increased or decreased as needed to accomplish that result.

However one may view the objectives of the JUA, the system did not achieve its goals. More and more drivers became unable to procure voluntary-market coverage, until by 1988 over 50% of New Jersey drivers had to be insured through the JUA. Claims against JUA insureds were sizeable and greatly exceeded the JUA's available income. Despite the imposition of substantial RMECs from 1988 through 1990, the JUA nonetheless accumulated a deficit of over $3.3 billion in unpaid claims and other losses.

Automobile insurance reform, including the reduction of the cost of insurance, and particularly some plan for eliminating the unwieldy JUA, repaying its debt, and replacing it with a more workable distribution of the automobile insurance market, became a priority for the Legislature and the executive branch in 1990. By March of that year the Reform Act had been adopted.

The principal goals of the Act were to reduce insurance costs for most New Jersey drivers, to depopulate the JUA by switching insureds to the voluntary market, and to create a funding mechanism to pay off the JUA debt. To these ends, the Act provided that the JUA would cease writing or renewing policies as of October 1, 1990. The "depopulation" of the JUA would be accomplished by classifying insured drivers into three categories: (1) high-risk drivers in the (revived) Assigned Risk Plan (10% of the market); (2) "non-standard" risk drivers, who would

be insured by private insurers directly, but who could be charged rates up to 135% of those of standard risks (15% of the market); and (3) standard-risk, voluntary-market insureds covered at prevailing rates (the remaining 75% of the market). Presumably, the higher rates now to be charged high-risk and "non-standard" risk drivers should bring the premium income on such coverage in line with actual costs, and this coverage would no longer be subsidized.

There remains, however, the problem of how to pay off the JUA's prior accumulated debt of over $3.3 billion; this, too, is addressed by the Reform Act. The Act creates the New Jersey Automobile Insurance Guaranty Fund (Auto Fund), a separate fund within the State Treasury, to collect and disburse the various payments designed to pay off the JUA debt. Reform Act, Section 23; *N.J.S.A.* 17:33B–5. The Act assigns to the Auto Fund certain sources of income that under the prior scheme went to the JUA, *e.g.*, surcharges for driving violations and drunken driving convictions. It also creates new sources of revenue for the Auto Fund, *e.g.*, fees on lawyers, doctors, and auto body repair businesses, higher automobile registration fees, and, most significant in the context of this litigation, the imposition of additional assessments and surtaxes on insurers. See Reform Act, Sections 63 through 68, *N.J.S.A.* 17:33B–58 through –63 (additional fees); Section 74, *N.J.S.A.* 17:30A–8a(9) and –8a(10) (assessments); Section 76, *N.J.S.A.* 17:33B–49 (surtaxes).

The assessments imposed on insurance carriers are collected through the Property Liability Insurance Guaranty Association (PLIGA). Reform Act, Section 74, *N.J.S.A.* 17:30A–8a(9). PLIGA was created in 1974 to impose assessments on New Jersey property-casualty insurers to pay claims against carriers that had become insolvent. (*L.* 1974, *c.* 17; *N.J.S.A.* 17:30A–1 through 17:30A–20.) See *Railroad Roofing & Bldg. Supply Co. v. Financial Fire & Casualty Co.*, 85 *N.J.* 384, 389–90, 427 *A.*2d 66 (1981). The Reform Act requires PLIGA to make additional assessments to be applied exclusively to the JUA

debt. These assessments, denominated by the Act as "loans," are paid into the Auto Fund. *N.J.S.A.* 17:30A–8a(10). They are to be set at rates designed to net $160 million per year for eight years (1990 through 1997); for 1990, the assessments represented 2.7% of net premiums of the property-casualty insurers.

Section 75 of the Reform Act, *N.J.S.A.* 17:30A–16, addresses recoupment from policyholders of PLIGA assessments both for insolvencies and for the JUA bailout. Insurers have always been permitted to pass through the insolvency assessments to policyholders. The insolvency passthrough originally was accomplished by rate increases, but in 1979 the method was changed to direct surcharges on policy premiums. The surcharges for insolvency assessments continue to be authorized under the Reform Act. *N.J.S.A.* 17:30A–16a. However, the Act expressly prohibits such surcharges to recover the new assessments for the JUA bailout. Section 75b states:

> No member insurer shall impose a surcharge on the premiums of any policy to recoup assessments paid pursuant to [the provision requiring assessments to be loaned to the Auto Fund]. [*N.J.S.A.* 17:30A–16b.]

In addition to the new assessments, the Reform Act, Section 76, imposes a special surtax on insurers to go toward the JUA bailout. *N.J.S.A.* 17:33B–49. This surtax is a greater amount, 5% of net premiums, but is imposed for a shorter period (only three years, 1990, 1991 and 1992), than the assessments. The additional surtax is designed to net a total of $300,000,000 over the three-year period into the Auto Fund. Reform Act, Section 77, *N.J.S.A.* 17:33B–50. Because the objective is to secure $300 million in net proceeds, the 5% surtax rate can be adjusted, depending upon the amount of insurers' net premiums. The 5% rate cannot be *exceeded*, and it is theoretically possible that the Director of Taxation could lower the rate; but such a lowering could occur only if automobile insurance net premiums increased significantly, a highly unlikely event given both the supposed premium-reducing effects of the Act and current market conditions. The Reform Act, Section 78, addresses the

question of whether the additional surtaxes can be charged to consumers:

The Commissioner of Insurance shall take such action as is necessary to ensure that private passenger automobile insurance policyholders shall not pay for the surtax imposed pursuant to section 76. [*N.J.S.A.* 17:33B–51.]

The insurers argue that because of the passthrough prohibitions of Sections 75 and 78, it is impossible for the Commissioner of Insurance to grant any rate relief to counteract the substantial loss of net income that will result from the new assessments and surtaxes. The insurers further claim that the assessments and surtaxes will necessarily cause them to operate at a loss, and they will thus be deprived of a constitutionally adequate rate of return.

The insurers point to their 1990 experience as an example of the impossibility of achieving a fair rate of return under the Act. They claim that the maximum profit they would be permitted under current ratemaking procedures would be 3.5% of premiums, and that a surtax of 5% and an assessment of 2.7% would necessarily more than offset the permitted return, and mandate an operating loss for 1990.

The State, to the contrary, argues (1) that Sections 75 and 78 do not absolutely prohibit rate relief; (2) that the insurers have failed to account for certain positive effects on their profitability that may result from the Act's so-called "cost-saving" provisions and from other statutory and regulatory means available for increasing rates; and (3) that Section 2g of the Act, *N.J.S.A.* 17:33B–2g, clarifies the Commissioner's authority to allow an adequate rate of return for all insurers.

## II.

The scrutiny of the Reform Act that the Court is here called on to perform is of limited scope. In considering the constitutionality of legislation, courts do not weigh its efficacy or wisdom. Moreover, legislative enactments "are presumed to be valid and the burden on the proponent of invalidity is a

heavy one." *Hutton Park Gardens v. Town Council*, 68 *N.J.* 543, 564–65, 350 *A.*2d 1 (1975). In challenges limited to the facial constitutionality of legislation, the effects on particular participants in an industry are not dispositive; rather, the question is whether the "mere enactment" of a statute offends constitutional rights. *Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc.*, 452 *U.S.* 264, 295, 101 *S.Ct.* 2352, 2370, 69 *L.Ed.*2d 1, 28 (1981) (citing *Agins v. City of Tiburon*, 447 *U.S.* 255, 260, 100 *S.Ct.* 2138, 2141, 65 *L.Ed.*2d 106, 112 (1980)). In cases dealing with the validity of price-control statutes, such as the Reform Act, holdings of facial unconstitutionality are exceedingly rare. See, *e.g., Guaranty Nat'l Ins. Co. v. Gates*, 916 *F.*2d 508 (9th Cir.1990) (Nevada statute freezing insurance rates held unconstitutional; provisions allowing rate relief only for insurers in danger of insolvency were not sufficient to assure a constitutionally adequate rate of return); *see also Birkenfeld v. City of Berkeley*, 17 *Cal.*3d 129, 550 *P.*2d 1001, 130 *Cal.Rptr.* 465 (1976) (rent-control ordinance did not meet even minimal due-process standard, because ordinance's procedures for reviewing landlords' rent-increase applications entailed such long delays that landlords would be forced to operate at an inadequate rate of return for indefinite periods).

The primary bases of the insurers' challenges to the Reform Act are the takings clause of the fifth amendment to the United States Constitution (as applicable to state action through the fourteenth amendment), the due process clause of the fourteenth amendment, and analogous provisions of the New Jersey Constitution. Although the takings and due process claims are factually interrelated and are ordinarily brought in tandem in challenges to governmental rate or price-control regulations, each is actually a distinct basis for challenge.

Of the two pertinent constitutional issues, the courts have developed more definite and clearer standards for substantive due process claims than for takings claims. This Court has chosen to apply the same standards developed by the United

States Supreme Court under the federal Constitution for resolving due process claims under the New Jersey Constitution. *Hutton Park Gardens, supra,* 68 *N.J.* 543, 350 *A.*2d 1. Courts have, of course, long been reluctant to interfere with the states' regulation of their internal economic affairs. Thus, the United States Supreme Court's 1934 decision of *Nebbia v. New York,* 291 *U.S.* 502, 525, 54 *S.Ct.* 505, 510, 78 *L.Ed.* 940, 950 (1934), upholding the constitutionality of a state system of price supports for milk, set the basic standard for validity under the due process clause: "the guaranty of due process ... demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained."

The standards governing takings claims originally developed in cases examining the constitutionality of the physical occupation of real property. Such standards became more fully and subtly developed in a number of United States Supreme Court cases dealing with government price regulation of utilities and the natural gas industry. See, *e.g., Duquesne Light Co. v. Barasch,* 488 *U.S.* 299, 109 *S.Ct.* 609, 102 *L.Ed.*2d 646 (1989); *Permian Basin Area Rate Cases,* 390 *U.S.* 747, 88 *S.Ct.* 1344, 20 *L.Ed.*2d 312 (1968); *FPC v. Hope Natural Gas Co.,* 320 *U.S.* 591, 64 *S.Ct.* 281, 88 *L.Ed.* 333 (1944). Further, many decisions involving rent-control ordinances have adopted and modified the law of takings and due process claims. *See, e.g., Pennell v. City of San Jose,* 485 *U.S.* 1, 108 *S.Ct.* 849, 99 *L.Ed.*2d 1 (1988); *Helmsley v. Borough of Fort Lee,* 78 *N.J.* 200, 394 *A.*2d 65 (1978), *appeal dismissed,* 440 *U.S.* 978, 99 *S.Ct.* 1782, 60 *L.Ed.*2d 237 (1979); *Hutton Park Gardens, supra,* 68 *N.J.* 543, 350 *A.*2d 1. To some extent, the precise applications of the legal standards must differ according to the characteristics of particular regulated industries. However, certain broad principles may be distilled from the decisional law as it has developed to date.

The standards for the constitutionality of government rate or price controls under the takings clause were set by the United

States Supreme Court's 1944 decision in *FPC v. Hope Natural Gas Co., supra*, 320 *U.S.* 591, 64 *S.Ct.* 281, 88 *L.Ed.* 333. There, the Court made clear that participants in a regulated industry are entitled to something more than mere survival:

> From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock.... By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital....
>
> [*Id.*, 320 *U.S.* at 603, 64 *S.Ct.* at 288, 88 *L.Ed.* at 345.]

The standards of *Hope Natural Gas* were reiterated in *Duquesne Light Co. v. Barasch, supra*, 488 *U.S.* 299, 310, 109 *S.Ct.* 609, 617, 102 *L.Ed.*2d 646, 659, where the Court interpreted *Hope* to require that determining the validity of rate setting under the takings clause should include scrutiny of "what is a fair rate of return given the risks under a particular rate setting system and ... the amount of capital upon which the investors are entitled to earn that return." We have posited a like standard: to avoid confiscatory results under the takings clause, "the return should be one which is generally commensurate with returns on investments in other enterprises having comparable risks." *Hutton Park Gardens, supra*, 68 *N.J.* at 570, 350 *A.*2d 1.

However, the constitutional requirement that a business be permitted a return sufficient to assure its financial health does not necessarily require any particular level of profit above what is adequate to attract and retain invested capital. "Regulation may, consistently with the Constitution, limit stringently the return recovered on investment, for investors' interests provide only one of the variables in the constitutional calculus of reasonableness." *Permian Basin Area Rate Cases, supra*, 390 *U.S.* at 769, 88 *S.Ct.* at 1361, 20 *L.Ed.*2d at 337 (citing *Covington & Lexington Turnpike Rd. Co. v. Sandford*, 164 *U.S.* 578, 596, 17 *S.Ct.* 198, 205, 41 *L.Ed.* 560, 566 (1896)). In price regulation, consideration of the investors'

interests must be counterbalanced by consideration of the consumers' interests. *Hope Natural Gas, supra,* 320 *U.S.* at 603, 64 *S.Ct.* at 288, 88 *L.Ed.* at 345 (ratemaking properly involves "a balancing of the investor and the consumer interests"). Similarly, in *Hutton Park Gardens, supra,* 68 *N.J.* 543, 350 *A.*2d 1, this Court recognized that a constitutionally "fair" rate of return may well involve a sacrifice of an untrammelled opportunity for profits on the part of the regulated business:

> The rate of return permitted need not be as high as prevailed in the industry prior to regulation nor as much as an investor might obtain by placing his capital elsewhere.... Determination of what level of return is "just and reasonable" involves evaluation not only of the interests of the investor but also of the interests of the consumer and of the general public sought to be advanced by the regulatory legislation.
>
> [*Id.* at 570, 350 *A.*2d 1 (citations omitted).]

Moreover, the reasonableness of price limitations is measured by the performance of skilled and efficient businesses, not of those that are inept or even unlucky. Price levels are "not objectionable merely because they fix returns at a lower scale for inefficient operators, do not reward persons who have paid excessive or inflated purchase prices for their property, or may otherwise work hardships ... in atypical situations." *Ibid.* In particular, government price controls do not have to allow passthroughs of particular cost increases in order to assure a constitutionally adequate rate of return. *See, e.g., FPC v. Texaco Inc.,* 417 *U.S.* 380, 94 *S.Ct.* 2315, 41 *L.Ed.*2d 141 (1974) (approving regulations requiring that natural gas pipelines and large producers, as middlemen between small producers and consumers, must absorb certain higher charges of the small producers without being permitted to pass those costs along to consumers); *Helmsley, supra,* 78 *N.J.* at 223, 394 *A.*2d 65 (a municipality is not constitutionally required to permit all of a landlord's cost increases to be passed through to tenants in rate-controlled units). In sum, while government regulation cannot wreak too great an interference with "distinct investment-backed expectations," *Penn Cent. Transp. Co. v. City of New York,* 438 *U.S.* 104, 124, 98 *S.Ct.* 2646, 2659, 57 *L.Ed.*2d

631, 648 (1978), a participant in a highly regulated industry must anticipate that its profit levels can be capped or even reduced by changes in government regulation. There is no constitutional entitlement to maximum profits. *Edgewater Inv. Assocs. v. Borough of Edgewater*, 103 *N.J.* 227, 240, 510 *A.*2d 1178 (1986).

Two recent cases have applied takings analysis to statutes strictly limiting rate increases for automobile insurance. *Guaranty Nat'l Ins. Co. v. Gates, supra,* 916 *F.*2d 508; *Calfarm Ins. Co. v. Deukmejian,* 48 *Cal.*3d 805, 771 *P.*2d 1247, 258 *Cal.Rptr.* 161 (1989). In *Calfarm,* the California Supreme Court addressed the facial constitutionality of an initiative, Proposition 103, requiring that on November 8, 1988, automobile insurance rates be reduced 20% below the rates in effect one year earlier. Holding on due process grounds but essentially applying a takings analysis, the court found unconstitutional a provision prohibiting rate relief for the first year unless an insurer were in danger of insolvency. *Id.,* 48 *Cal.*3d at 821, 771 *P.*2d at 1255–56, 258 *Cal.Rptr.* at 170. Nevertheless, the court upheld the statute as it applied to future years, relying on another provision that prohibited the Insurance Commissioner from "approv[ing] or [maintaining] in effect [any rate] which is excessive, inadequate, [or] unfairly discriminatory." The court concluded that the latter provision reflected a general legislative intent to assure a fair rate of return and reasoned that "[s]ince a confiscatory rate is necessarily an 'inadequate rate' under the statutory language, [the statute] requires rates within that range which can be described as fair and reasonable and prohibits approval or maintenance of confiscatory rates." *Id.* at 822–23, 771 *P.*2d at 1256–57, 258 *Cal.Rptr.* at 171.

In *Guaranty National Insurance Company v. Gates, supra,* 916 *F.*2d 508, 510, the Court of Appeals for the Ninth Circuit examined a Nevada statute that required a fifteen-percent rate rollback and did not permit any rate relief for the first year unless an insurer were "substantially threatened with insolvency." The court concluded that there was no guarantee

for a constitutionally adequate rate of return for the first year
of the regulatory scheme because of the prohibition of any rate
relief except under circumstances of impending insolvency. In
considering the facial constitutionality of the statute with re-
spect to future years, the court followed the same analysis used
by the California Supreme Court in *Calfarm*, but reached an
opposite conclusion. The court examined a general statutory
provision that prohibited "excessive, inadequate, or unfairly
discriminatory" rates. *Id.* at 515. It found that this provision
prohibiting "inadequate" rates did not save the statute's consti-
tutionality, because the statute defined "inadequate" to guaran-
tee only a break-even return, not a constitutionally fair and
reasonable return. *Ibid.*

The insurers here couch their challenges to the validity of the
Reform Act surtaxes and assessments in terms similar to those
invoked by the plaintiffs in *Calfarm* and *Guaranty National
v. Gates*. They assert that the substantial additional costs of
the new assessments and surtaxes will necessarily restrict
carriers to a negative, or a break-even, or only a minimally
positive return and therefore claim that, because the Act pre-
cludes any possibility of recovery of those costs, it is a confisca-
tory taking.

### III.

The facial constitutionality of the Reform Act depends on
whether the new burdens on the insurers, the surtaxes and
assessments, necessarily preclude a fair rate of return. That
determination in turn requires the resolution of two questions—
first, do Sections 75 and 78 of the statute absolutely bar cost
passthroughs to offset the impact of the assessments and
surtaxes; and second, if one or both of those new costs cannot
be recovered through standard rate relief, does the Reform Act
nonetheless permit the Commissioner otherwise to set rates
that would provide a fair rate of return. Resolution of those
questions requires examination of the statutory language, the
legislative history, and the administrative interpretation of the

interrelationship among Sections 2g, 75, and 78 of the Reform Act.

### A.

Sections 75 and 78 embody the Legislature's directives on the treatment of the assessments and surtaxes in ratemaking. Section 75, dealing with the assessments, provides:

No member insurer [of PLIGA] shall impose a surcharge on the premiums of any policy to recoup assessments paid [to PLIGA for the loans to pay off the JUA debt]. [*N.J.S.A.* 17:30A–16b.]

Section 78 states with respect to the surtaxes:

The Commissioner of Insurance shall take such action as is necessary to ensure that private passenger automobile insurance policyholders shall not pay for the surtax imposed pursuant to section 76. [*N.J.S.A.* 17:33B–51.]

The insurers have argued that both of the foregoing provisions absolutely forbid passthroughs, or indeed any recoupment, of the new costs in the ratemaking process. They maintain that Section 78's prohibition could not be clearer; the Legislature demands that the Commissioner "ensure that ... policyholders shall not pay" for the surtaxes. While Section 75, pertaining to the assessments, is less absolute on its face, the insurers nonetheless maintain that it likewise entirely prohibits rate passthroughs. Although Section 75 literally would only preclude "surcharge[s] on the premiums of ... polic[ies]," the insurers note that surcharges are the only means for passing along PLIGA assessments to cover insolvencies. Thus, the insurers maintain, in enacting Section 75, the Legislature must have considered the prohibition of "surcharges" to foreclose the only means of adding PLIGA assessments to the rates paid by policyholders.

The State asserts that Sections 75 and 78 do not completely preclude the consideration of the assessments and surtaxes in the ratemaking process. As to Section 75, the State maintains that a prohibition of "surcharges" is not a prohibition against otherwise accounting for the PLIGA assessments in ratemaking. Regarding the treatment of the surtaxes in Section 78

particularly, and regarding both the assessments and the sur-
taxes generally, the State argues that the intendment of other
provisions of the Reform Act is to allow for some relief from
the assessments and surtaxes in the Commissioner's setting of
rates. Specifically, the State contends that Section 2g of the
Act, *N.J.S.A.* 17:33B–2g, counterbalances the prohibitions of
Sections 75 and 78. Section 2g provides:

> To provide a healthy and competitive automobile insurance system in this State,
> automobile insurers are entitled to earn an adequate rate of return through the
> ratemaking process. [*N.J.S.A.* 17:33B–2g.]

Sections 75 and 78, according to the State, must be read in
conjunction with Section 2g, and considered together, these
provisions demonstrate that the Reform Act does not impose an
absolute bar to the recovery of the surtaxes and assessments
through ratemaking.

In determining whether Sections 75 and 78 absolutely prohib-
it passthroughs, there is no real room for doubt that the
mandatory terms of Section 78 demonstrate the Legislature's
intent to preclude entirely any consideration of the surtaxes in
standard ratemaking: "The Commissioner ... *shall* take such
action ... to *ensure* that ... policyholders *shall not pay for
the surtax*". (Emphasis added.) While Section 75 is less
absolute in tone, its terms were evidently influenced by the
surcharges for insolvency assessments that insurers historical-
ly have been permitted to add directly to policyholders' premi-
ums. See *Railroad Roofing & Bldg. Supply Co.*, *supra*, 85
*N.J.* at 390 n. 4, 427 *A.*2d 66. We believe that it is consistent
both with the more obvious prohibition of Section 78, and with
the use of surcharges as the only recognized method for
passing along insolvency assessments, to construe Section 75's
prohibition of "surcharge[s] ... to recoup assessments" as
absolute. The idiosyncratic language of Section 75, in context,
indicates that the Legislature intended to foreclose the only
existing means by which costs of the assessments could be
shifted directly to consumers.

If we were remitted only to the terms of Sections 75 and 78, we would be constrained to rule that those provisions standing alone do not allow any recovery of the assessments and surtaxes through rate increases. However, while Sections 75 and 78 foreclose relief in standard ratemaking, Section 2g implicitly grants the Commissioner overriding authority to guarantee insurers a fair rate of return by some means other than direct passthrough. Thus, Section 2g does not contradict the prohibition, under Sections 75 and 78, of direct pass-throughs of the costs of the surtaxes and assessments. *See Seatrain Lines, Inc. v. Medina,* 39 *N.J.* 222, 226–27, 188 *A.*2d 169 (1963) (the provisions of a statute should be construed in harmony and as together effecting the overall legislative intent). Section 2g expressly acknowledges that "automobile insurers are *entitled* to earn an adequate rate of return through the *ratemaking process." N.J.S.A.* 17:33B–2g (emphasis added). The statute should be liberally construed as giving the Commissioner ample authority to follow that directive and achieve the legislative objective. *See Allendale Field and Stream Ass'n v. Legalized Games of Chance Control Comm'n,* 41 *N.J.* 209, 217, 195 *A.*2d 620 (1963) ("[w]e should liberally construe the [statute] to permit the agency to achieve the task assigned to it, and should imply, if need be, incidental powers reasonably adapted to that end"). The sensible integration and application of Sections 2g, 75, and 78 have been committed by the Legislature to the discretion of the Commissioner of Insurance.

The State further asserts that various provisions of the Act provide additional or supplementary means for the insurers to obtain relief from inadequate rates, despite the direct passthrough prohibitions of Sections 75 and 78. In particular, if an insurer is at risk because of an "unsafe or unsound financial condition," the Commissioner may suspend (1) its obligation to accept the allocation of risks under an Assigned Risk Plan, *see* Reform Act, Sections 91 and 92, *N.J.S.A.* 17:33B–23 and –24; (2) its obligation to issue or renew automobile policies, Reform

Act, Sections 93 and 94, *N.J.S.A.* 17:33B–27 and –28; (3) its obligation to pay PLIGA assessments, Reform Act, Sections 95 and 96, *N.J.S.A.* 17:33B–55 and –56; and (4) its obligation to pay the premiums surtax, Reform Act, Sections 98 and 99, *N.J.S.A.* 17:33B–52 and –53. The State also points out that carriers can increase their income through available "flex rate" increases, which permit insurers to raise rates by amounts related to increases in certain components of the Consumer Price Index without prior regulatory approval. *N.J.S.A.* 17:29A–44. Further, the Act contains various "cost-saving" provisions, which the State contends are likely to decrease insurers' costs and thus increase profitability. These include provisions that cap personal-injury benefits, Reform Act, Section 4, *N.J.S.A.* 39:6A–4; allow an insured to select a health insurer as the primary carrier for personal-injury benefits, Reform Act, Section 6, *N.J.S.A.* 39:6A–4.3; establish fee limits on health-care providers, Reform Act, Section 7, *N.J.S.A.* 39:6A–4.6; require inspection of automobiles prior to providing physical-damage coverage, Reform Act, Sections 41 through 48, *N.J.S.A.* 17:33B–33 through –40; establish an anti-fraud program, Reform Act, Section 51, *N.J.S.A.* 17:33B–42; and provide limits on towing and storage charges, Reform Act, Section 60, *N.J.S.A.* 17:33B–47. The insurers, with considerable vigor, argue that the cost "savings" that the State attributes to the foregoing provisions are problematic and unrealistic. Nevertheless, while the "cost-saving" and other statutory provisions may not individually or collectively assure a fair rate of return for insurers, as the State stresses, they do increase the possibility of avoiding confiscatory rates.

In summary, the State contends that the Legislature stopped short of an absolute prohibition against any form of rate relief for the surtaxes and assessments. The insurers assert that the Legislature believed the provisions it enacted effected an absolute prohibition. Those arguments go beyond the plain terms of the Reform Act and draw support from the Act's legislative history to bolster the parties' respective positions. If the plain

language of a statute is not entirely determinative of its meaning, the statutory history may be examined to discover the legislative intent. *Lloyd v. Vermeulen*, 22 *N.J.* 200, 125 *A.*2d 393 (1956).

Most items put forward as "legislative history" of the Reform Act are either newspaper accounts or Assembly floor debate statements that were recorded by a consultant to plaintiff Allstate. Even if the relevance and reliability of such items may be questionable, there are certain elements of the legislative history concerning the fate of various proposed amendments that are pertinent to the intended effects of Sections 75 and 78, and of Section 2g.

On February 24, 1990, while the Reform Act was being considered by the Assembly Appropriations Committee, Assemblyman Kamin introduced amendments to Sections 75 and 78. After the bill had been reported out of committee, similar amendments were proposed to the entire Assembly by Assemblyman Haytaian on March 2, 1990. *See* Amendments proposed by Assemblyman Haytaian to Assembly, No. 1, 204th Leg., 1st Sess. (1990) (Haytaian Amendments). Both sets of proposed amendments were intended to strengthen the prohibitions of passthroughs. The amendment to Section 75 proposed by Assemblyman Kamin provided:

> No member insurer shall impose a surcharge on the premiums of any policy to recoup assessments paid [for the PLIGA loans to the Auto Fund] or include any amount of the assessments ... as an expense in any insurance rate filing. [Amendments proposed by Assemblyman Kamin to Assembly, No. 1, 204th Leg., 1st Sess. (1990) (Kamin Amendments), p. 11.]

The proposed amendment to Section 78 provided:

> No insurer or rating organization shall include as an expense in any insurance rate filing any amount paid for the surtax imposed pursuant to section 76. [Kamin Amendments, pp. 11–12.]

The statement accompanying those amendments explained that they "make the pass through language more restrictive in regard to the premium tax surcharges and the assessments by the Property–Liability Guaranty Association." Kamin Amendments, p. 13.

The Assembly Appropriations Committee and the entire Assembly, respectively, rejected the Kamin Amendments and the Haytaian Amendments to Sections 75 and 78. Although the proposed changes would have strengthened the passthrough prohibitions, opponents maintained that no strengthening was necessary because passthroughs were already completely prohibited. On balance, insofar as one can surmise from the unofficial and unsanctioned record of the debates, the defeat of the Kamin and Haytaian Amendments may indicate that a majority of the members of the Assembly found the amendments to be superfluous because the prohibitions of passthroughs were already absolute. However, we need not further analyze the significance of this proffered history. Although the proposed amendments may have stated the prohibitions with more specificity, that does not obviate the conclusion that the prohibitions are absolute in the statute as finally adopted. "Enacted legislation may express more generally what was expressed more specifically in proposed legislation." *Holmdel Builders Ass'n v. Township of Holmdel,* 121 *N.J.* 550, 575, 583 *A.*2d 277 (1990). Moreover, the Commissioner of Insurance has similarly interpreted the prohibitions as absolute in the regulations implementing the Reform Act, explaining that the surtaxes and assessments "may not be incorporated into the expense base for determining rates.... [S]ections 75 and 78 ... prohibit direct pass-through of the assessment or surtax to policyholders." "Rate Filing Requirements: Voluntary Market Private Passenger Automobile Insurance", Department of Insurance Summary of Emergency Amendments dated November 26, 1990 (Rate Filing Requirements), p. 6. See discussion *infra* at 58–61, 590 *A.*2d at 204–206.

Another significant event in the legislative history of the Reform Act was the addition of Section 2g, *N.J.S.A.* 17:33B–2g. Section 2g was not part of the Reform Act as initially drafted. It was among the amendments introduced while the bill was being considered by the Assembly Appropriations Committee. Although the proposed amendments that would have strength-

ened the passthrough prohibitions of Sections 75 and 78 were rejected, the Legislature chose to add Section 2g, which emphasizes that insurers "are entitled to earn an adequate rate of return", to the Act as finally adopted.

Thus, the legislative history of the Reform Act suggests how the separate terms of Sections 75 and 78 and of Section 2g can be reconciled. That history supports the conclusion, fairly evident from the language of Sections 75 and 78, that passthroughs of surtaxes and assessments in the form of direct premium increases or direct rate relief are absolutely prohibited. However, the addition of Section 2g to the original bill demonstrates the Legislature's awareness and accommodation of the constitutional requirement that insurers must receive a fair rate of return. It is reasonable to conclude that the Legislature conferred on the Commissioner of Insurance the necessary implied authority to satisfy the constitutional standard that it expressly acknowledged in the statute.

Whether it is possible to secure a fair rate of return under this statutory scheme—the ultimate judicial question to be answered in resolving the insurers' facial attack on the statute—is a difficult and important issue that has already been addressed by the Department of Insurance.

## B.

Recently-adopted regulations of the Department of Insurance governing when and how rate relief may be available to offset the surtaxes and assessments corroborate the legislative meaning suggested by the statutory text and history, i.e., that a fair rate of return is to be assured under the Reform Act despite the specific prohibitions of Sections 75 and 78. That administrative understanding is persuasive evidence of the intent of the Legislature in enacting the regulatory scheme. *See, e.g., Smith v. Director, Div. of Taxation*, 108 *N.J.* 19, 25–26, 527 *A.*2d 843 (1987); *Malone v. Fender*, 80 *N.J.* 129, 137, 402 *A.*2d 240 (1979).

On November 26, 1990, the Commissioner issued "emergency regulations" to implement the Reform Act; those regulations, with certain amendments, were permanently adopted on January 25, 1991. The regulations and their implications for the constitutional validity of the Reform Act were addressed by the parties on appeal. The Insurance Department's summary of the regulations governing rate filings emphasizes the Act's prohibition of passthroughs. It also explains that the regulations establish a special, separate rate-increase filing procedure for any insurer who believes that the effect of the surtaxes and assessments, in its particular case, is to preclude a constitutionally adequate rate of return:

N.J.A.C. 11:3–16.10 is amended to confirm that the Property–Liability Insurance Guaranty Association assessment and the surtax imposed by sections 74 and 76 of the Act, respectively, may not be incorporated into the expense base for determining rates. This implements sections 75 and 78 of the Act which prohibit direct pass-through of the assessment or surtax to policyholders. The Act and the Constitution of the United States, however, provide that insurers are entitled to earn an adequate rate of return through the ratemaking process. An insurer may thus request rate relief if it is unable to earn an adequate rate of return due to imposition of the assessment or surtax. Accordingly, the Department is proposing a new rule, N.J.A.C. 11:3–16.11, which sets forth the filing requirements for an insurer desiring to modify its rates to reflect the assessment or surtax. The data filed will enable the Commissioner to evaluate the insurer's experience on all lines of business in New Jersey; the insurer's operational efficiency; the insurer's method of allocation of expenses; and the synergistic effect of mandated private passenger automobile insurance on the profitability of other lines of business.

[Rate Filing Requirements, *supra*, pp. 6–7.]

The requirements for standard rate-increase filings have heretofore prohibited the inclusion of certain expenses, *e.g.*, fines, lobbying costs, punitive damages, and the like. The new regulation, *N.J.A.C.* 11:3–16.10(b)8, reflects the Department's understanding that the Reform Act prohibits passthroughs altogether, both of assessments and of surtaxes, as expense-side items in standard rate-increase filings. The new regulation adds to the prior itemization of prohibited expenses:

The following expense items shall not be incorporated into the expense base for determining rates:

\* \* \* \* \* \* \* \*

vii. Assessments and surtaxes imposed pursuant to [Sections 74 and 76 of the Reform Act], respectively.

Further, with respect to the PLIGA assessments, the new regulations provide that if these "loans" are ever repaid, insurers shall reduce their rates accordingly:

Prior to receiving repayment of any funds attributable to the assessments ... an insurer shall file a plan with the Commissioner for a reduction of rates commensurate with such repayment. [*N.J.A.C.* 11:3–16.13(c).]

On the other hand, in its explanation of the new regulations, the Department of Insurance has specifically acknowledged that the terms of Sections 75 and 78 prohibit only dollar-for-dollar passthroughs, and do not negate the overriding entitlement of insurers to a fair rate of return:

Insurers may not directly "pass-through" assessments and/or surtaxes imposed by the ... Act on a dollar for dollar basis to policyholders pursuant to *N.J.S.A.* 17:30A–16 [Section 75] and 17:33B–51 [Section 78]. Thus, assessments and/or surtaxes are excluded from the expense base in determining rates using standard methodologies. However, an insurer may request an increase in rates on the basis that it is required to pay assessments and/or surtaxes. Because these expenses are generally excluded, however, the insurer must demonstrate that it is unable to earn a constitutionally adequate rate of return unless these expenses are considered.

["Rate Filing Requirements: Voluntary Market Private Passenger Automobile Insurance," Department of Insurance Summary of Comments and Agency Responses, dated January 25, 1991, p. 28.]

To that end, the regulations provide a new procedure for separate rate-increase filings by insurers who can demonstrate that payment of the surtaxes and assessments has denied them a fair rate of return. Under these provisions, the Commissioner is given discretion to allow rate relief when necessary:

The Commissioner may determine whether an insurer's rates are, as a result of the payment of the surtaxes and assessments, constitutionally adequate. In the event that the Commissioner determines that rate relief is deemed to be necessary, the Commissioner shall determine whether the rates should be adjusted immediately or over time, as may be appropriate. [*N.J.S.A.* 11:3–16.11(f).]

Thus, the Department of Insurance interprets the Reform Act as authorizing consideration of the economic effect of the surtaxes and assessments in addressing an insurer's claim that it is being deprived of a constitutionally adequate return. Fur-

ther, the Department apparently intends that in such circumstances, it will take the surtaxes and assessments into account in ratemaking despite the Act's directive that insurers cannot obtain a direct passthrough or include those costs as expense-side items in standard rate-increase filings.

## C.

In sum, Section 2g of the Act demonstrates the Legislature's overall intent to make certain that any lessening of insurers' profits due to the surtaxes and assessments would not preclude a constitutionally adequate rate of return. Moreover, even were this construction doubtful, we would accept it in order to avoid an interpretation of the statute that would render it unconstitutional. *See In re Kimber Petroleum Corp.*, 110 *N.J.* 69, 83, 539 *A.*2d 1181 (1988) (when necessary, courts can rely on meanings implied by a statute's provisions to preserve its constitutionality). The Legislature deliberately left to the Commissioner of Insurance the determination of the precise constitutionally required rate of return, as being within the area of expertise entrusted to the Department of Insurance in its long exercise of the ratemaking function. In *N.J.A.C.* 11:3–16.11, the Commissioner has created a mechanism for individual insurers to seek special rate relief to assure a fair rate of return. In view of the possibilities offered by that regulation, which are as yet untried, we cannot now say that Sections 75 and 78 of the Reform Act would make it impossible for any insurer to achieve a fair rate of return.

Considering the Reform Act's terms and the interrelationship of its several provisions, the legislative history, and the Insurance Department's regulations, we conclude that the Reform Act absolutely prohibits rate relief to insurers in the form of direct passthroughs of surtaxes and assessments in standard ratemaking. Nonetheless, the Legislature's assurance of an adequate rate of return under Section 2g and the creation of a special rate-relief process under *N.J.A.C.* 11:3–16.11 demon-

strate that the prohibitions of Sections 75 and 78 do not necessarily preclude all insurers from earning a fair rate of return. Read literally, the Act and regulations appear to prohibit insurers from treating the surtaxes and assessments as expenses for standard rate-making purposes, but nevertheless allow, if not require, the Commissioner to consider the surtaxes and assessments in affording rate relief to an insurance company otherwise unable to earn a fair rate of return. Thus, Sections 75 and 78 are not facially unconstitutional as a confiscatory taking.

Nor have the insurers established that the surtax and assessment rates in effect for 1990 are necessarily confiscatory or preclude a fair rate of return. The State has conceded that a targeted profit of 3.5% of premiums may well be adjusted if constitutionally required. Further, such a claim has not been established merely on the basis of the percentages of income asserted here. Any arguments based upon actual profits or losses of particular insurers for 1990 would be more appropriately asserted in administrative ratemaking proceedings or as part of an as-applied challenge to the Act.

We acknowledge uncertainty about how the Act may be applied by the Commissioner in individual rate-increase determinations. For example, the language of *N.J.A.C.* 11:3–16.11 arguably may only permit, rather than require, the Commissioner to grant rate relief to insurers who cannot achieve a fair rate of return. See discussion *supra* at 59–60, 590 *A.*2d at 205–206. Further, the rate application process of *N.J.A.C.* 11:3–16.11 by its very complexity may carry the potential for frustrating in practice the achievement of a fair rate of return. *See Birkenfeld v. City of Berkeley, supra,* 17 *Cal.*3d 129, 550 *P.*2d 1001, 130 *Cal.Rptr.* 465 (rent-control ordinance held unconstitutional because process for granting rent increases was subject to unreasonable delays). However, in light of our obligation to presume the constitutionality of legislation, we will also presume that the Commissioner will fulfill his duty under the statute to assure that insurers receive a constitutionally fair

rate of return, and will implement the regulations in a realistic and timely manner consistent with that statutory duty.

■ Because we find that the Act is facially valid, it will be appropriate for the Commissioner to render determinations on individual insurers' rate-increase applications in the first instance, before challenges to the constitutionality of the application of the statute and regulations are brought. The Department of Insurance has the particular expertise necessary to develop the detailed record of an insurer's financial performance that must form the basis for any as-applied challenge. See *Abbott v. Burke*, 100 *N.J.* 269, 296–300, 495 *A.*2d 376 (1985) (as-applied constitutional challenge to school funding statute transferred to Commissioner of Education for development of factual record).

The plaintiffs here, or any other affected insurers, are free to institute as-applied challenges to the Reform Act in the event that the relief afforded to them under *N.J.A.C.* 11:3–16.11 is either substantively or procedurally inadequate to assure a constitutionally fair rate of return. We imply no view on whether the statute and regulations will pass constitutional muster in the event of an as-applied challenge.

## IV.

■ Since we hold that the Reform Act does not, on its face, impose a confiscatory taking, *a fortiori* we find that it meets the minimal requirements for constitutionality under a substantive due process analysis. That is, the Reform Act's scheme for prohibiting direct passthroughs of the surtaxes and assessments, while permitting the Commissioner of Insurance to grant insurers special rate relief when necessary, is not "unreasonable, arbitrary or capricious"; and this statutory and regulatory approach to the problem of availability of automobile insurance has "a real and substantial relation to the object sought to be attained". *Nebbia v. New York, supra*, 291 *U.S.* at 525, 54 *S.Ct.* at 511, 78 *L.Ed.* at 950.

In addition to the takings and due process claims, certain of the insurers' other facial constitutional claims have been addressed fully by the parties before the lower courts and on this appeal, and can be determined at present.

 Allstate, Liberty Mutual, and State Farm have all claimed that compelling the insurers to pay part of the JUA debt violates the contract clause, *U.S. Const.* art. I, § 10, because the insurers had been promised under the JUA program that they would not be individually liable for JUA claims or debts. However, the legal standards for a violation of the contract clause are strict: the United States Supreme Court has often noted that even though the contract clause sounds definite on its face, it must be applied very flexibly. *See, e.g., Allied Structural Steel Co. v. Spannaus*, 438 *U.S.* 234, 240, 98 *S.Ct.* 2716, 2720, 57 *L.Ed.*2d 727, 733–34 (1978) ("The [Contract] Clause is not ... the Draconian provision that its words might seem to imply. As the Court has recognized, 'literalism in the construction of the contract clause ... would make it destructive of the public interest by depriving the State of its prerogative of self-protection' ", quoting *W.B. Worthen Co. v. Thomas*, 292 *U.S.* 426, 433, 54 *S.Ct.* 816, 818, 78 *L.Ed.* 1344, 1347 (1934)). To be an unconstitutional impairment of contracts, legislation (1) must substantially impair a contractual relationship; (2) must lack a significant and legitimate public purpose; and (3) must be based upon unreasonable conditions and be unrelated to appropriate governmental objectives. *Energy Reserves Group, Inc. v. The Kansas Power & Light Co.*, 459 *U.S.* 400, 411–12, 103 *S.Ct.* 697, 704–05, 74 *L.Ed.*2d 569, 580–81 (1983).

In the case of the Reform Act's imposition of costs on insurers to cover the debt of the JUA, we do not believe that, in the first instance, there was any contractual relationship for the Act to impair. The JUA was simply a regulatory scheme for the insurance of high-risk drivers; like all regulatory schemes, it was potentially transient, subject to change at any time by the Legislature that had created it. In a highly regulated

business such as insurance, participants cannot credibly assert that they had any vested right or contractual expectation in the indefinite continuance of the JUA scheme. Moreover, even if there were an impairment of a contractual relationship, it would nonetheless be justified in this instance because the Reform Act addresses a significant and legitimate public purpose, imposing reasonable conditions that are related to appropriate governmental objectives. *Energy Reserves Group, supra,* 459 *U.S.* 400, 103 *S.Ct.* 697, 74 *L.Ed.*2d 569.

■ Allstate and Liberty Mutual assert an additional constitutional claim, *i.e.,* that the Reform Act is a bill of attainder, in that it is intentionally punitive legislation directed specifically against insurers. The United States Supreme Court has distilled three recurring characteristics of bills of attainder from its line of decisions on such claims:

(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes"; and (3) whether the legislative record "evinces a [legislative] intent to punish."

[*Selective Serv. Sys. v. Minnesota Pub. Interest Research Group,* 468 *U.S.* 841, 852, 104 *S.Ct.* 3348, 3355, 82 *L.Ed.*2d 632, 643 (1984) (quoting *Nixon v. Administrator of Gen. Serv.,* 433 *U.S.* 425, 473, 475–76, 478, 97 *S.Ct.* 2777, 2805, 2806–07, 2808, 53 *L.Ed.*2d 867, 910, 911, 913 (1977)).]

Historically, legislative punishments have taken the forms of death sentences, imprisonment, banishment, confiscation of property, and barring the attainted parties from specified employment or vocations. *Nixon, supra,* 433 *U.S.* at 474, 97 S.Ct. at 2806, 53 *L.Ed.*2d at 910–911. Of those punishments, only confiscation of property could conceivably apply here. Since we have found the Reform Act not to be confiscatory under a takings analysis, we likewise find that it is not a punitive confiscation, and the Act thus does not meet the first of the three standards for a bill of attainder. Moreover, as our substantive due process analysis would indicate, the Act does reasonably further legitimate legislative purposes, and thus does not meet the second criterion. As to the third criterion, a

legislative intent to punish, while the insurers cite various statements of legislators allegedly evincing a punitive intent, those statements are an insignificant part of the extensive debate over insurance reform that has engaged the attention of both the executive and legislative branches of the government in recent years. Overall, the legislature was clearly much more concerned with resolving an impasse concerning automobile insurance costs and availability, than it was with placing particular burdens on insurers. Thus, the Reform Act does not exhibit any of the characteristics of a bill of attainder as they have been defined by the courts.

Other claims alleged in the insurers' complaints, *e.g.*, that the Act's "producer assignment program" violates due process, that the Act subjects mutual insurers to an extraterritorial tax, and that the Act violates the Commerce Clause of the United States Constitution, have been eclipsed by the more central issues during the unusual procedural history of these cases. Thus, those claims have not been fully addressed by the parties on this appeal, and they were not the subject of specific rulings by the courts below. Therefore, we decline to decide those claims, acknowledging that they may, if appropriate, be renewed in subsequent proceedings.

## V.

In accordance with this opinion, we determine that the Reform Act is facially constitutional. The Chancery Division's judgment is reversed in part and modified in part.

GARIBALDI, J., concurring.

I concur in the Court's opinion. However, I write separately to emphasize that this statute is still susceptible to an as-applied challenge. I have grave doubts about the ability of the Commissioner of Insurance, under present regulations, to guarantee insurance companies a constitutionally-adequate rate of

return. The present rate-making structure is lengthy and complex; the addition of the special separate-hearing procedure for rate relief will only add to existing delay. Although the length of time before rate relief is granted may not, alone, make the scheme constitutionally defective, *Helmsley v. Borough of Fort Lee*, 78 *N.J.* 200, 223, 394 *A.*2d 65 (1978), *appeal dismissed*, 440 *U.S.* 978, 99 *S.Ct.* 1782, 60 *L.Ed.*2d 237 (1979) the possibility for relief from confiscatory rates must be realistic. *Id.*, at 226, 394 A.2d 65; *see also Calfarm Ins. Co. v. Deukmejian*, 48 *Cal.*3d 805, 817, 771 *P.*2d 1247, 1253, 258 *Cal.Rptr.* 161, 167 (1989) (court may strike down facially-valid law because procedures enacted under it "were so cumbersome and time-consuming that [affected persons] could not in reality obtain relief from confiscatory rates").

Despite these doubts, I concur. The procedures established by the Commissioner may prove more effective than I predict, or he may adopt others. I have no desire prospectively to usurp his administrative expertise. As the trial court here noted, often "the effect of a delay must be judged in hindsight, and it cannot be reliably predicted to amount to a constitutional interdiction." Nevertheless, that the Commissioner take steps presently to ensure a fair rate of return is imperative, especially in light of the holding in *In the Matter of the Loans of the New Jersey Property Liability Insurance Guaranty Association to the New Jersey Automobile Insurance Guaranty Fund Pursuant to the New Jersey Fair Automobile Insurance Reform Act of 1990* (*L.* 1990, *c.* 8), 124 *N.J.* 69, 590 *A.*2d 210 (1991), a related case also decided today, that makes repayment of the NJ PLIGA "loans" an indeterminate intention rather than a contractual debt. Lack of action by the Commissioner coupled with an inability to determine when, or if, those "loans" will be recouped would make sound financial planning impossible.

Current economic conditions compound my concerns. In the past, insurance companies, like banks, were always considered financial bulwarks. That is no longer true. *See* Crenshaw, "Personal Finance: Finding The Best Life Insurance; Buyers Must Consider Firm's Solvency As Well As Policy Cost," *Washington Post,* December 16, 1990, at H9 ("in the current economic uncertainty, the possibility [of an insurance company becoming insolvent] can no longer be overlooked"); Floyd, "Market Place: Failing Insurers' Bailout Cost Rises," *New York Times,* November 15, 1988, at D8, col. 3 (estimates of costs of saving failing insurance companies have soared from $82,000,000 in 1984 to $917,000,000 in 1987). Although the size of the accumulated unpaid debt of the Joint Underwriting Association is deplorable, the failure or withdrawal of insurance companies providing coverage in this state would prove even more damaging. Therefore, it is imperative that insurance companies actually receive a "fair and adequate rate of return" within a reasonable period of time. *Cf. Helmsley, supra,* 78 *N.J.* at 242, 394 *A.*2d 65 (holding that a more moderate regulatory scheme, *i.e.,* one that does not attempt to keep investors' returns at the constitutional minimum, must be adopted where the governing body is not prepared to support a sophisticated administrative relief system providing for prompt, fair and efficacious processes). Neither the insurance company nor this state's insurance market will be adequately protected by the pyrrhic discovery after it has ceased doing business here (and perhaps elsewhere) that it deserved a rate increase five years ago.

*For reversal in part, affirmance in part*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.