256 N.J. Super. 553 (1992)
607 A.2d 992
IN THE MATTER OF THE ORDER OF THE COMMISSIONER OF INSURANCE DEFERRING CERTAIN CLAIM PAYMENTS BY THE NEW JERSEY AUTOMOBILE FULL INSURANCE UNDERWRITING ASSOCIATION.
Superior Court of New Jersey, Appellate Division.
Argued April 8, 1992.
Decided May 11, 1992.
*554 Before Judges DREIER, GRUCCIO and BROCHIN.
Michael Gordon argued the cause for appellants Helena Markowska, Marla Pino, Evelyn Pino, Kelly Sanders, Mary Sanders and Association of Trial Lawyers of America-New Jersey (Gordon & Gordon, attorneys; Harrison J. Gordon, Michael Gordon and Rosemary E. Lynch, on the brief).
Hugh P. Francis argued the cause for respondent New Jersey Automobile Full Insurance Underwriting Association (Francis & Berry, attorneys (Hugh P. Francis, of counsel; Peter A. Olson, on the brief).
Bernard M. Flynn argued the cause for respondent Commissioner of Insurance (Robert J. Del Tufo, Attorney General, *555 attorney; Joseph L. Yannotti, of counsel; Allan J. Nodes and Bernard M. Flynn, on the brief).
The opinion of the court was delivered by GRUCCIO, J.A.D.
This appeal involves an application by Helena Markowska, Marla Pino, Evelyn Pino, Kelly Sanders, Mary Sanders and the Association of Trial Lawyers of America-New Jersey (claimants) for a stay pending appeal of the Plan of Operation (the Plan) devised by the trustee for the New Jersey Automobile Full Insurance Underwriting Association (JUA) and implemented by the Commissioner of Insurance. After balancing the countervailing interests, we deny the stay, but order an administrative hearing on the Plan pursuant to the Administrative Procedure Act.
The JUA is an unincorporated, non-profit underwriting organization consisting of companies licensed to write automobile insurance in New Jersey. The JUA was created pursuant to the New Jersey Automobile Full Insurance Availability Act, N.J.S.A. 17:30E-1 to -24, the purpose of which was to provide automobile insurance to persons unable to obtain coverage in the voluntary market.
On March 12, 1990, the Fair Automobile Insurance Reform Act of 1990 (FAIRA) was signed into law. L. 1990, c. 8. This act provided, inter alia, for the termination of the JUA as the provider of private passenger automobile liability insurance to the New Jersey residual market. N.J.S.A. 17:33B-2h(2).
Through the FAIRA Act, the Legislature recognized that the JUA was operating under a $3 billion deficit which had been incurred over six years. N.J.S.A. 17:33B-3(a). In light of this deficit, the Legislature eliminated the JUA and precluded it from issuing or renewing insurance policies after October 1, 1990. N.J.S.A. 17:30E-7e. The Legislature also eliminated the assessment of residual market equalization charges after March 31, 1991. N.J.S.A. 17:30E-8a.
*556 Knowing this would drastically reduce the JUA's income, the Legislature created the New Jersey Automobile Insurance Guarantee Fund (NJAIGF), a non-lapsing treasury fund dedicated to satisfying the financial obligations of the JUA. N.J.S.A. 17:33B-5. The NJAIGF was funded by surtaxes, assessments and other charges imposed by the FAIRA Act. N.J.S.A. 17:33B-49 and 17:33A-8. Although challenged on constitutional grounds, the NJAIGF's legislative scheme was upheld by the New Jersey Supreme Court in State Farm Mut. Auto. Ins. Co. v. State, Comm'r of Ins., 124 N.J. 32, 590 A.2d 191 (1991).
The Legislature authorized the Commissioner to appoint a trustee to carry out the purposes of evaluating, prioritizing and satisfying the JUA's obligations. N.J.S.A. 17:33B-2h(3). The FAIRA statute required the trustee to promulgate a Plan of Operation to administer the affairs of the JUA as though it were an insolvent insurer. N.J.S.A. 17:33B-3b(1). The Plan was to be approved by the Commissioner of Insurance and was to have as its aim the liquidation of the JUA and the satisfaction of its financial obligations. N.J.S.A. 17:33B-3b(2). The Plan was to include a schedule for the prioritization of claim payments, and allowed for deferral of residual bodily injury payments for up to four years. N.J.S.A. 17:33B-3b(2).
The Commissioner of Insurance appointed Marshall Selikoff, a retired Superior Court judge, to serve as the JUA's trustee. The trustee's first Plan of Operation was approved by the Commissioner on March 20, 1991. It provided for the payment of covered losses on behalf of the JUA, the deferral of claims and used language identical to that found in the FAIRA Act.
At that time, the JUA's financial condition was critical. The premium income ceased on October 1, 1990, pursuant to FAIRA's requirements. On April 1, 1991, the last two sources of JUA income, the residual market equalization charge and the policy constant, also terminated. N.J.S.A. 17:33B-6. Despite the Legislature's contemplated means of satisfying the JUA's *557 claims through the NJAIGF, most of those funds were held in escrow pending the outcome of litigation challenging the constitutional validity of FAIRA.
As a result, the trustee proposed and the Commissioner approved a short-term three-month deferral plan in April 1991. In May 1991, the Supreme Court declared FAIRA constitutional and on July 1, 1991, the Legislature appropriated the monies from the NJAIGF for use by the JUA trustee. The Commissioner vacated the short-term deferral order on July 2, 1991.[1]
Thereafter, the trustee requested implementation of a long-term deferral of JUA residual bodily injury claims on the basis that JUA funds would be entirely depleted by the end of 1991. He recommended a 15-month deferral of residual bodily injury claims at 6% interest. The trustee requested that the deferral plan be implemented in secrecy without notice to the public, stating:
Claim disbursements issued for the last seven work days in April averag[ed] a staggering 13.5 million daily compared to an average of 6.1 million daily for the 15 days immediately preceding the acceleration.
This type of payment acceleration cannot be allowed to occur prior to implementation of a long term plan.
On August 5, 1991, the Commissioner published a public notice in the New Jersey Register, 23 N.J.R. 2432, stating that the Commissioner of Insurance was authorized to approve the deferral of JUA residual bodily injury loss payments in accordance with N.J.S.A. 17:33B-3b(2). The notice requested comments from the public regarding the appropriate elements and procedural aspects for such a deferral plan should that action be needed.
On December 17, 1991, the Commissioner issued an order implementing the trustee's plan for a 12-month deferral of *558 payment on residual bodily injury claims against the JUA. The Commissioner stated in his deferral order:
The trustee's studies indicate that, even with the two previously noted NJAIGF draw-downs and the anticipated third disbursement, the Association will run short of cash at the latest by January 1992. Specifically, if there is no deferral of claim payments and the third disbursement is received, the Association is expected to run $38.7 million short of funds by January 1992 net of "float" (i.e. that amount of checks that have been issued but not yet cashed). This situation has arisen because the value of the claims expected to be submitted for payment during the early stages of the Association's liquidation has exceeded the amount of revenue generated by the FAIR Act for the same period. Moreover, if the association does not receive any additional disbursement from the (NJAIGF) and does not implement a deferral of claims, the Association advises that it will run out of cash totally by December 27, 1991.
The Commissioner concluded that a deferral of certain claims was necessary beginning on December 18, 1991, to avoid the short-fall of JUA revenues expected by January 1992. Thus, he ordered that residual bodily injury claims[2] be deferred for 12 months, except for such claims as may be granted exemption from deferral by the trustee based on hardship grounds.[3] The Commissioner ordered that when deferred claims were paid, they would include simple interest at 6% beginning on the date of the deferral. N.J.S.A. 17:33B-3b(2).
*559 The briefs of both the Commissioner of Insurance and the JUA indicate that the JUA's financial condition remains critical. The Commissioner posits that the JUA had a cash reserve sufficient to continue operating for no more than 12 business days as of February 13, 1992. Thus, a stay of the deferral order as to all settlements entered into prior to December 18, 1991, would pose an immediate threat to the JUA's ability to continue functioning and paying claims. On February 14, 1992, the trustee requested a disbursement of $97.7 million from the NJAIGF which will only minimally exceed $87.5 million, the estimated amount required to remain solvent. No further funding is anticipated until the middle of May 1992.
Claimants contend that several claims and settlements procured prior to December 18, 1991, were, nonetheless, included in the freeze.[4] They seek the following relief in regard to this matter: Reversal of the Commissioner's December 17, 1991, order; payment of all judgments obtained and settlements *560 entered prior to the effective date of the order; and remand of this matter to the Commissioner for a rehearing on the merits.
Claimants contend that the Commissioner's order should be stayed pending the outcome of this appeal. They claim that the stay is required since the plan was implemented in blatant disregard of procedural and substantive due process.
We have considered the standards for granting a stay, set forth in Crowe v. DeGioia, 90 N.J. 126, 447 A.2d 173 (1982). Here, however, we find no basis for the issuance of a stay. The irreparable harm suffered by the public, as a whole, far exceeds the potential burden placed upon the claimants. We believe, however, that a hearing must be held in accordance with the Administrative Procedure Act. See N.J.S.A. 52:14B-1 to -21.
Claimants contend that the Commissioner failed to follow the proper notice procedure for implementing an agency rule, thus depriving them of procedural due process. Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 337, 478 A.2d 742 (1984). In response, the Commissioner claims that the JUA is not a state agency and thus the promulgation of the Plan did not need to comply with the Administrative Procedure Act.
In support of this position, the Commissioner cites In re Comm'r of Ins.'s Certification of Amendment to the New Jersey Auto. Full Ins. Underwriting Ass'n Plan of Operation, 254 N.J. Super. 620, 604 A.2d 172 (App.Div. 1992) and an unreported decision of the Appellate Division. Although these cases provide that the JUA is not a state agency in certain contexts, the rationale supporting that conclusion is inapplicable here. In this case, compliance with the Administrative Procedure Act was essential to protect the policyholders' contract rights and the status of the current tort law.
The cases cited by the Commissioner involve an amendment to and a receipt of premium provision in plans promulgated by the Commissioner and the JUA. In In re Comm'r, we determined that since the content of a plan's amendment was appropriate *561 for inclusion in the original plan, it required no separate promulgation, in accordance with the Administrative Procedure Act, since the plan, itself, was properly promulgated. In the unreported opinion, mailing rules included in a plan were determined to be properly a part thereof as valid rules of general application. No separate promulgation was required. Here, however, the entire Plan was issued with neither the notice period nor the opportunity for comment required by the Administrative Procedure Act. Its effect was not a general one but, rather, required a certain group of claimants to shoulder the JUA's financial chaos. The Plan was promulgated within the auspices of state government through the Commissioner's participation and authority. Thus, compliance with the Administrative Procedure Act is necessary.
The JUA and the Commissioner contend, however, that the necessity of governmental supervision is obviated by the JUA's status as an independent entity. We disagree. The JUA has been protected from insolvency by legislative guidance. The rehabilitation procedure drawn for the JUA has been specifically promulgated by the Legislature and supervised by the Commissioner of Insurance. Being the object of legislative salvation, the JUA has clearly benefited by state action. Thus, it must abide by state procedure when implementing a course of action which will affect thousands of taxpayers.
Moreover, if the JUA were to be considered an independent entity in receivership, it would be subject to the jurisdiction of the Chancery Division, General Equity. Lippmann v. Hydro-Space Technology, Inc., 77 N.J. Super. 497, 506, 187 A.2d 31 (App.Div. 1962). In that situation, the Chancery Division, General Equity, would have the inherent and statutory power to appoint a receiver who would acquire title to the corporation's assets and be empowered to dissolve it. See N.J.S.A. 14A:14-4. The insolvent corporation's creditors would be given the opportunity to have input in the proceedings and to examine the corporation's records to determine if and when payments would be made. This entire proceeding would be supervised by the *562 Chancery Division, General Equity. See Wilzig v. Sisselman, 209 N.J. Super. 25, 31, 506 A.2d 1238 (App.Div. 1986), certif. den., 107 N.J. 109, 526 A.2d 181 (1987); Booream v. Washington Casualty Ins. Co., 110 N.J. Eq. 164, 159 A. 519 (Chan. 1932). The rights of policyholders with an insolvent private insurer cannot exceed those of JUA claimants, who are entitled to equal protection and assurance of constitutional due process.
The authority of the JUA to devise a plan of operation does not avoid the Administrative Procedure Act. The JUA is an instrumentality of the State having been created, funded and terminated by statute. N.J.S.A. 17:30E-1 to 22; N.J.S.A. 17:33B-2h(2); N.J.S.A. 17:33B-5. We noted in In re Comm'r, supra, that the amendment to the plan, though not complying expressly with the Administrative Procedure Act, nonetheless provided for constitutionally adequate notice and time to be heard. The implementation of the Plan here, however, ignored not only the requirements of the Administrative Procedure Act, but also afforded no notice or hearing, thereby depriving the policyholders of their constitutional rights. Furthermore, no record was developed which would enable us to adjudicate the necessity and validity of the trustee's Plan. This manner of implementation cannot stand.
In the interest of fairness and the preservation of procedural due process, this case is remanded for a full administrative hearing which shall incorporate public input. Moreover, the problems of funding availability and the sources of funding for payment of the deferred claims shall be disclosed upon demand. All procedural aspects of the hearing, including the notice provisions, shall be conducted in accordance with the Administrative Procedure Act.
The denial of stay appealed from is affirmed and the matter remanded for a proper administrative hearing within 60 days of this opinion.
Affirmed in part; remanded in part.
NOTES
[1] An appeal of the short-term deferral order was filed on May 15, 1991, by plaintiffs, which was subsequently dismissed by the Appellate Division on November 8, 1991.
[2] A residual bodily injury loss is defined in the Plan as a "liability claim for loss of any kind whatsoever ..., resulting from liability imposed by law for or as a result of a bodily injury or death."
[3] On February 3, 1992, the Commissioner of Insurance approved administrative procedures for claims to hardship exemptions. The circumstances constituting acceptable grounds for the hardship exemption included: Claimant, spouse or dependent has incurred substantial medical expenses over $5,000 not related to the motor vehicle accident and not covered by insurance; the claimant, spouse or dependent cannot pay for essential food and shelter such that the party must face imminent eviction or foreclosure from their principal residence; claimant, spouse or dependent faces immediate removal from a nursing home, hospital or medical care institution due to the inability to pay; the applicant cannot pay funeral expenses of the claimant, spouse or dependent and the death is not related to the subject matter vehicle accident; and other emergency or situation of an unusual nature which may be deemed to be appropriate based on materials provided.
[4] For example, Heather Deegan sustained a closed brain injury with cognitive deficits in a motor vehicle accident. Ms. Deegan's case settled for $287,500 on December 18, 1991. Due to the Commissioner's freeze, however, Ms. Deegan will not be paid the settlement for at least another nine months.

Jaclynn Pazur suffered a fractured pelvis and ilium, compression fracture of T11 and T12 in a motor vehicle accident. She has required medial meniscectomy and chondroplasty. Her case settled on December 11, 1991, for $155,000. Ms. Pazur, however, has not, and will not be paid until the freeze is lifted.
Joseph and Rosemarie Olivelli settled their accident claim on November 7, 1991, for $45,000. The release was forwarded to the JUA attorneys the same day. The claim was not paid before the December 18 deadline, and therefore is now subject to the claim deferral. Similarly, Antonio Fridman's release was forwarded to the JUA claim management on October 21, 1991. That claim also was not paid before December 18 and is now subject to the deferral.
Plaintiff's appendix contains releases from several other accident victims who settled claims and submitted releases prior to the deferral. Nonetheless, the settlement drafts were not paid prior to December 18 and therefore all of these accident victims will wait at least one year to receive their money.