**In the Matter of Diane B. KENT, Debtor.**

**Bankruptcy No. 94–11145.**

United States Bankruptcy Court,
D. New Jersey.

Dec. 5, 1995.

**198**

John F. Rodgers, Haddonfield, New Jersey, for debtor Diane Kent.

Marc Alan Krefetz, Deputy Attorney General, State of New Jersey, for Division of Motor Vehicles.

Thomas M. North, Albertson, Ward & McCaffrey, for Gloucester County Bar Association as amicus curiae.

JUDITH H. WIZMUR, Bankruptcy Judge.

In this case, we are called upon to revisit the issue of the non-dischargeability, under 11 U.S.C. § 523, of motor vehicle surcharges assessed by the New Jersey Division of Motor Vehicles ("DMV"). In *Lugo v. Paulsen,* 886 F.2d 602 (3d Cir.1989), the Third Circuit Court of Appeals determined that motor vehicle surcharges were non-dischargeable under 11 U.S.C. § 523(a)(9). A subsequent amendment to subsection (a)(9) in 1990 necessitates a return to the issue.

### FACTS

The debtor, Diane B. Kent, filed a voluntary petition under Chapter 13 of the Bankruptcy Code on March 17, 1994. Debtor's case was converted to Chapter 7 on August 17, 1994. The Chapter 7 Trustee filed a Report of No Distribution on December 5, 1994. Debtor received a discharge under Chapter 7 on December 19, 1994, and her case was closed on December 22, 1994. Debtor moved to reopen her case on March 13, 1995 to amend her schedule of unsecured creditors to include the claim of the Division of Motor Vehicles in the amount of $5,160 for pre-petition unpaid motor vehicle surcharges, asserting that she inadvertently failed to include this claim in her original petition. Over the DMV's objection, the case was re-opened to allow the amendment, and to determine whether the DMV claim may be discharged.

The DMV offers alternative arguments to designate its claim as non-dischargeable, contending that a pre-petition motor vehicle surcharge may be characterized either as an excise tax under § 523(a)(1) (with reference to § 507(a)(8)(E)), or as a civil penalty under § 523(a)(7). Debtor responds that a surcharge is neither a tax nor a penalty, but simply a means of raising additional premiums for high-risk drivers, and that the statutory changes in the surcharge system in New Jersey since *Lugo* do not alter the outcome that the DMV claim is dischargeable. Supporting debtor's cause, the Bankruptcy Committee of the Gloucester County Bar Association, by amicus curiae submission, contends that for § 523(a)(7) purposes, the motor vehicle surcharge is not a penalty, and is not payable to and for the benefit of a governmental unit.

### DISCUSSION

When the Third Circuit opinion in *Lugo v. Paulsen, supra,* was decided, § 523(a)(9), upon which the decision was premised, provided that no discharge would issue on a debt:

> to any entity, to the extent that such debt arises from a judgment or consent decree entered in a court of record against the debtor wherein liability was incurred by such debtor as a result of the debtor's operation of a motor vehicle while legally intoxicated under the laws or regulations of any jurisdiction within the United States or its territories wherein such motor vehicle was operated and within which such liability was incurred.

11 U.S.C. § 523(a)(9) (1989). The Criminal Victims Protection Act of 1990, Pub.L. 101–581 substituted "for death or personal injury caused by the debtor's operation of a motor vehicle if such operation was unlawful because the debtor was intoxicated from using alcohol, a drug, or another substance" for the language noted above.[1] The amendment ef-

---

1. The identical amendment was enacted in the Crime Control Act of 1990, Pub.L. 101–647, Nov. 29, 1990.

fectively limited non-dischargeable debts under subsection (a)(9) to debts premised on death or personal injury caused by an intoxicated driver.[2] The section no longer has applicability to motor vehicle surcharges.

█ With subsection 523(a)(9) removed as a basis for the non-dischargeability of surcharges, the DMV proposes that such surcharges are non-dischargeable under subsection 523(a)(7), which provides that a debt is non-dischargeable:

> (7) to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss, other than a tax penalty—
>
> (A) relating to a tax of a kind not specified in paragraph (1) of this subsection; or
>
> (B) imposed with respect to a transaction or event that occurred before three years before the date of the filing of the petition.

11 U.S.C. § 523(a)(7). To conclude that plaintiff's claim is non-dischargeable for purposes of section 523(a)(7), we must determine that there is (1) a debt; (2) for a fine, penalty, or forfeiture; (3) payable to a governmental unit; (4) for the benefit of a governmental unit; and (5) not as compensation for actual pecuniary loss, other than a tax penalty.

█ The first, third and fifth elements need not be debated. That a motor vehicle surcharge constitutes a debt, rather than "an additional insurance premium", has been clearly established. *Lugo v. Paulsen,* 886 F.2d at 606; *In re Christensen,* 95 B.R. 886 (Bankr.D.N.J.1988); *In re Bill,* 90 B.R. 651 (Bankr.D.N.J.1988). The obligation is collected by and payable directly to the DMV, which is undeniably a governmental unit. *See* N.J.S.A. 17:29A–35(b). As well, to the extent that the surcharge obligation constitutes compensation for actual pecuniary loss, i.e., to the extent that a percentage of the amount collected is used to defray administrative expenses, the debt is dischargeable. *In re Lugo,* 94 B.R. 335, 341 (D.N.J.1989). Moreover, we are not concerned here with a tax penalty, which, of course, relates to some

underlying tax. *McKay v. U.S.,* 957 F.2d 689 (9th Cir.1992); *In re Roberts,* 906 F.2d 1440 (10th Cir.1990); *In re Burns,* 887 F.2d 1541, 1544 (11th Cir.1989); *In re Leahey,* 169 B.R. 96 (Bankr.D.N.J.1994).

Our focus then is on whether the motor vehicle surcharge is a fine, penalty or forfeiture, and whether the surcharge is payable for the benefit of a governmental unit. To address these questions, we review the statutory scheme creating the surcharge and the various amendments to that scheme in recent years.

*New Jersey Automobile Insurance Reform*

*A. 1983 Reform*

Compulsory automobile insurance coverage in New Jersey began with the enactment in 1972 of the New Jersey Automobile Reparation Reform Act, N.J.S.A. 39:6A–1 to 6A–35, also known as the "No–Fault Act". The act was intended to provide "an informal system of settling tort claims arising out of automobile accidents in an expeditious and least costly manner, and to ease the burden and congestion of the State's courts." N.J.S.A. 39:6A–24. The No–Fault Act required all drivers to carry liability, personal injury protection, and uninsured motorist insurance, *see id.* at §§ 39:6A–3, –4, and –14 respectively, and mandated that every insurance company licensed to write insurance for private passenger automobiles in the State become a member of the New Jersey Automobile Insurance Risk Exchange (the "Exchange" or the "Risk Exchange"). N.J.S.A. 39:6A–21. Each member was bound by the rules of the Exchange as a condition of doing business within the State. The Exchange was "an unincorporated association," operating on a "nonprofit-nonloss basis", designed to regulate the maximum insurance rate for high-risk drivers. It was to be funded by charges, known as AIRE charges, against each of the members of the association. N.J.S.A. 39:6A–22. High risk motorists who could not normally obtain insurance coverage were insured through an Assigned Risk Plan, N.J.S.A. 17:29D–1, wherein the Commissioner of Insurance apportioned the high risk

---

**2.** The amendment also prevented the discharge of debts premised on death or personal injury caused by an intoxicated driver in the Chapter 13 context. *See* 11 U.S.C. § 1328(a)(2).

applicants among all of the insurers. This new mandatory system of insuring all drivers led to increased operating costs for insurers and higher premiums for New Jersey motorists.

In response, the New Jersey State Legislature enacted L.1983, c. 65, effective January 1, 1983, operative January 1, 1984. Sections 1 to 12 of the act were referred to as the "New Jersey Automobile Insurance Reform Act of 1982" ("NJAIRA" or "Reform Act") (codified in N.J.S.A. 17:29A–33 to –47). Sections 13 to 34 of the act were referred to as the New Jersey Automobile Full Insurance Availability Act (codified in N.J.S.A. 17:30E–1 to –24). The 1982 legislation replaced the Assigned Risk Plan with the New Jersey Automobile Full Insurance Underwriting Association, commonly known as the Joint Underwriting Association or JUA.

All insurers licensed to write automobile insurance in New Jersey were required to be members of the JUA. The objective of the new scheme was to create a more extensive system of allocating high-risk drivers to carriers, and through the JUA, to provide such drivers with coverage at rates equivalent to those charged in the voluntary market. . . .

. . . Insurers (and subsequently certain qualified non-insurer entities) could apply to become "servicing carriers," which would bear administrative responsibility for collecting premiums, arranging coverage, and the like, and which would receive fees for such services from the JUA. . . . [C]laims and liabilities of the JUA would be borne by it independently; servicing carriers were to be insulated from such claims and liabilities. . . .

Because the JUA insured high-risk drivers but also required that their rates be the same as voluntary-market rates (see N.J.S.A. 17:30E–13), it was anticipated that premium revenues would not cover costs of claims against JUA policies. Therefore, in addition to normal premium income, the JUA was also given income from Department of Motor Vehicle surcharges for moving violations and drunk driving convictions, policy "flat charges," and "residual market equivalization charges," or RMECs, to be added to policy rates for voluntary-market insurers. N.J.S.A. 17:30E–8. Thus, the JUA was a system in which the insurance costs of high-risk drivers were subsidized by the imposition of fees on segments of the general population of motorists. The JUA was supposed to be operated on a no-profit, no-loss basis, with RMECs increased or decreased as needed to accomplish that result.

*State Farm Mutual Automobile Ins. Co. v. State*, 124 N.J. 32, 41–42, 590 A.2d 191 (1991).

The enactment, in N.J.S.A. 17:29A–35(b), of surcharges against all drivers who accumulate six or more points for motor vehicle offenses under Title 39 or are convicted of drunk driving under N.J.S.A. 39:4–50,[3] was designed to augment the funding needed by the JUA to insure high-risk drivers and to regulate the imposition of surcharges upon such drivers. The surcharge scheme, administered through what was designated as the "New Jersey Merit Rating Plan", was designed to "alleviate disparate surcharges by implementing a uniform dollar scale to be levied for violations of motor-vehicle laws," and to then redirect those monies to provide the necessary funding for the JUA. *State, Department of Law and Public Safety v. Bigham*, 119 N.J. 646, 653, 575 A.2d 868 (1990); N.J.S.A. 17:29A–35. *See* Ad Hoc Committee Report on Automobile Insurance Reform in the State of New Jersey, Chairman's Report, 23–25 (January 3, 1979).[4] In

---

**3.** The act was amended in 1984 to impose surcharges for motor vehicle violations for which points do not attach. L.1984, c. 1, § 2; N.J.S.A. 17:29A–35(b)(3)(B).

**4.** The Chairman explained:

There are two inequities in the present surcharge system. Insurance points are levied for minor violations or accidents, and surcharges are levied haphazardly in the voluntary mar-

ket. For example, some companies surcharge in the voluntary market for very minor violations and accidents, and others charge only for major violations or accidents. This creates a situation in which two drivers with the same accident and violation record might be treated very differently in terms of the amount of surcharge [insurance points] which they are required to pay.

*Id.* at 23–24.

this respect, the "insurers are surcharged equally for comparable Title 39 violations and overall driving records." *Id.* at 654, 575 A.2d 868. "[T]he rule has a beneficial social impact 'by assessing surcharges for serious motor vehicle offenses [so that] those who violate the traffic safety laws [are] financially responsible for the increased costs of insurance.'" *Id.* at 655, 575 A.2d 868. The "central idea [is] that significant motor vehicle offenses should be deemed the basis for the imposition of an insurance surcharge." *Id.*

### B. *1990 and 1994 Reform*

The JUA system implemented in 1983 did not achieve its goals. By 1990, the JUA had accumulated a debt of over $3.3 billion in unpaid claims and other losses, and shouldered the burden of insuring over 50% of New Jersey drivers. *State Farm v. State,* 124 N.J. at 42, 590 A.2d 191.

On March 12, 1990, the legislature enacted the Fair Automobile Insurance Reform Act, N.J.S.A. 17:33B–1 *et seq.* ("the FAIR Act" or "FAIRA"), which sought to depopulate the JUA by switching insureds to the voluntary market, and to create a funding mechanism to pay off the JUA debt. *Id.* Commencing October 1, 1990, the issuance and renewal of automobile insurance policies previously issued by the JUA would be arranged through a newly created entity known as the Market Transition Facility ("MTF"). N.J.S.A. 17:33B–11. The MTF was also comprised of every insurer authorized to transact automobile insurance in New Jersey, and was operated by the Commissioner of Insurance. *Id.* The MTF was authorized to issue and renew policies only through October 1, 1992, at which point the issuance and renewal of policies to applicants who were unable to procure coverage through the voluntary market

would return to that market through apportionment by the Commissioner of Insurance. N.J.S.A. 17:29D–1; N.J.S.A. 17:33B–22.

The funding mechanism created by the 1990 legislation to collect funds and to pay off the JUA debt was the New Jersey Automobile Insurance Guaranty Fund ("Auto Fund"), a separate fund created within the State Treasury. N.J.S.A. 17:33B–5. The Auto Fund collects surcharges paid to the DMV for driving violations and drunk driving convictions, fees levied on lawyers, doctors and auto body repair businesses, higher automobile registration fees, and additional assessments and surtaxes on insurers. N.J.S.A. 17:33B–58 through 63 (additional fees); N.J.S.A. 17:30A–8a(9) and 8a(10) (assessments); and N.J.S.A. 17:33B–49 (surtaxes). The monies maintained in the Auto Fund were initially dedicated to satisfy the financial obligations of the JUA. N.J.S.A. 17:33B–5d. In 1994, this subsection was amended to reflect that following satisfaction of all JUA current and anticipated financial obligations, or commencing on January 1, 1996, whichever is later, DMV surcharge proceeds will be utilized to satisfy all Market Transition Facility and Market Transition Facility Revenue Fund obligations.[5] Thereafter, following satisfaction of all MTF obligations, surcharge proceeds will be directed to the New Jersey Property–Liability Insurance Guarantee Association ("PLIGA"), an entity created in 1974 to impose assessments on New Jersey property-casualty insurers to pay claims against carriers that had become insolvent, N.J.S.A. 17:30A–6. N.J.S.A. 17:33B–5(b). PLIGA had been statutorily directed to make certain loans to the JUA. N.J.S.A. 17:30A–8(a)(10). Payments from the surcharge proceeds will be used to repay the PLIGA loans. N.J.S.A. 17:29A–35(b)(2),

---

**5.** The Market Transition Facility Revenue Fund was created within the New Jersey Economic Development Authority to satisfy the principal and interest on bonds issued in conjunction with the Good Driver Protection Act of 1994, L.1994, c. 57, § 1 eff. June 29, 1994 (codified in N.J.S.A. 34:1B–21.1 *et seq.*). N.J.S.A. 34:1B–21.7. The Good Driver Protection Act resolved litigation between the State and the insurance industry wherein the industry must contribute $439 million in MTF assessments, and their 1996–97 Property/Liability Guaranty Fund Association as-

sessments of $320 million will be redirected to the MTF. The remaining debt will be paid with the proceeds of a $750 million bond sale to be serviced by revenues from the surcharges. The litigation was spurred by allegations that the Commissioner of Insurance improperly maintained insurance rates at too low of a level to break even. Senate Budget and Appropriations Committee Statement, Senate, No. 1250–L.1994, c. 57. *See also* Russ Bleemer, *Last Hurdle for the MTF: $700 Million Bond Sale,* 137 N.J.L.J. 4 (July 11, 1994).

as amended by L.1994, c. 57, § 20, eff. June 29, 1994.

With this background, we examine the remaining elements of section 523(a)(7), i.e. whether the motor vehicle surcharge is a fine, penalty or forfeiture, and whether the surcharge is payable for the benefit of a governmental unit.

*For a Fine, Penalty or Forfeiture.*

■ The Bankruptcy Code does not define the terms "fine", "penalty", or "forfeiture". Black's Law Dictionary (6th Ed.1990) defines a "penalty" as "a sum of money which the law exacts payment of by way of punishment for doing some act which is prohibited." *Id.* at 1133. The definition describes precisely what a motor vehicle surcharge is. The surcharge is an assessment which must be paid as a consequence of violations of certain motor vehicle laws.

Indeed, several cases have designated motor vehicle surcharges as civil penalties. In *Clark v. New Jersey Div. Of Motor Vehicles,* 211 N.J.Super. 708, 711 (App.Div.1986), in the context of determining that the statute assessing insurance surcharges did not violate the constitutional prohibition against *ex post facto* laws, the New Jersey Superior Court Appellate Division labeled surcharges as a "statutory system of civil penalties," noting that "the purpose and effect of the Merit Rating Plan surcharges are clearly remedial and civil." *See also In re Bill,* 90 B.R. 651, 655 (Bankr.D.N.J.1988) (the surcharge is a penalty imposed to supplement the JUA). We conclude that a motor vehicle surcharge constitutes a "penalty" for purposes of section 523(a)(7).

The Gloucester County Bar Association, as amicus curiae, suggests that a determination by this court that motor vehicle surcharges are "civil penalties" would by implication render those assessments violative of the constitutional prohibition against successive punishments for the same offense, or double jeopardy. In this regard, amicus cites to the United States Supreme Court case of *United States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1987).

■ In *Halper,* the Court considered "whether and under what circumstances a civil penalty may constitute 'punishment' for the purpose of double jeopardy analysis." 490 U.S. at 436, 109 S.Ct. at 1895. Noting that the characterization of the assessment as either "criminal" or "civil" in either the statute or the legislative history is not conclusive, the Court reasoned that "the determination whether a given civil sanction constitutes punishment in the relevant sense requires a particularized assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve. Simply put, a civil as well as a criminal sanction constitutes punishment when the sanction as applied in the individual case serves the goals of punishment." *Id.* at 448, 109 S.Ct. at 1901–02. The Court concluded that "under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution." *Id.* at 448–49, 109 S.Ct. at 1902. The protections of the Double Jeopardy Clause proscribe a subsequent civil action resulting in a judgment "not rationally related to the goal of making the Government whole", *Id.* at 451, 109 S.Ct. at 1903, and "the discretion to determine . . . the size of the civil sanction the Government may receive without crossing the line between remedy and punishment" lies with the trial court. *Id.* at 450, 109 S.Ct. at 1902. *See also Department of Revenue v. Kurth Ranch,* —— U.S. ——, ——, 114 S.Ct. 1937, 1945, 128 L.Ed.2d 767 (1994).

The New Jersey Supreme Court addressed the *Halper* issue in *Merin v. Maglaki,* 126 N.J. 430, 599 A.2d 1256 (1992). In *Merin,* defendant was convicted of a crime for submitting a fraudulent life insurance claim in an unsuccessful attempt to collect $300,000 in proceeds on the life of his wife, who was still living. He was sentenced to five years probation, five hundred hours of community service and $530 in fines. Following the criminal conviction, the Commissioner of Insurance filed a civil suit against the defendant seeking to impose $30,000 in civil penalties. The New Jersey Supreme Court, holding that the potential imposition

of civil penalties in the amount sought did not violate the double jeopardy clause, stated that it was "not troubled by the fact that the state has not proven the exact extent of its damages nor provided precise calculations to support the penalties imposed." *Id.* at 445, 599 A.2d 1256. The Court noted that the civil penalties were remedial, since "all revenues from civil penalties imposed pursuant to the Act are credited to the New Jersey Automobile Full Insurance Underwriting Association Auxiliary Fund ... which is used to defray costs associated with government insurance programs." *Id.* at 445, 599 A.2d 1256. *See also No Illegal Points v. Florio,* 264 N.J.Super. 318, 333, 624 A.2d 981 (App. Div.) *certif. denied* 134 N.J. 479, 634 A.2d 526 (1993) (assessment of points did not violate double jeopardy in light of remedial and rehabilitative purpose behind the system).

■ Similarly, the motor vehicle surcharges statutorily imposed upon individuals who violate particular motor vehicle offensives are neither excessive nor punitive in the criminal sense. The purpose of the surcharge is to fund the JUA and to help cover the JUA's deficits. *In re Lugo,* 94 B.R. 335 (D.N.J.1989). The surcharges are recognized to be "civil and remedial, rather than punitive, in nature." *Lugo v. Paulsen,* 886 F.2d at 610. We therefore reject the amicus contention that imposition of motor vehicle surcharges violates the double jeopardy clause.

We conclude that a motor vehicle surcharge constitutes a debt for a "fine, penalty, or forfeiture," within the meaning of section 523(a)(7).

*For the Benefit of a Governmental Unit.*

As we noted above, motor vehicle surcharges, net of administrative collection costs retained by the DMV, are applied by statute first to satisfy the obligations of, or to "benefit", the JUA, and then to satisfy the obligations of, or to "benefit", the MTF. We must determine whether either or both of these entities are governmental units of the State of New Jersey, for purposes of 11 U.S.C. § 523(a)(7).

In *In re Lugo,* 94 B.R. 335 (D.N.J.1989), Judge Sarokin analyzed the issue of whether motor vehicle surcharges were payable "for the benefit of a governmental unit" as follows:

Under N.J.S.A. 17:29A–35(b)(2), as amended, at least ninety per cent of the surcharge bill is remitted to the JUA, a *private* association of insurance companies. The DMV retains only the *actual cost* of administering the collection of the surcharges.

It is clear that section 523(a)(7) does not apply to moneys payable to the JUA, since it is not a governmental unit. The DMV, which is a governmental unit, retains only money necessary to compensate it for the actual cost of administering the collection, or the government's "actual pecuniary loss." The surcharge is therefore not within the definition of a Section 523(a)(7) exception.

*Id.* at 341. The Third Circuit's affirmance of Judge Sarokin's decision was based on § 523(a)(9) grounds, and did not address Judge Sarokin's § 523(a)(7) discussion.

We have determined to reexamine the issue for several reasons. In *Lugo,* Judge Sarokin's attention was focused upon the non-dischargeability of the surcharge under § 523(a)(9). The mention of § 523(a)(7) criteria was included as dictum. Secondly, significant statutory changes have been implemented since the *Lugo* decision in the area of automobile insurance reform, e.g., the Fair Automobile Insurance Reform Act, N.J.S.A. 17:33B–1 *et seq.;* the Good Driver Protection Act of 1994, N.J.S.A. 34:1B–21 *et seq.*

■ The Bankruptcy Code defines a "governmental unit" as the "United States; Commonwealth; District, Territory; municipality; foreign state; department, agency, or instrumentality of the United States ..., a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government." 11 U.S.C. § 101(27).[6] The legislative history of

6. The term "governmental unit" is used throughout the Code, including in § 101(15) (definition of an entity), § 106 (concerning sovereign immunity), § 362(b) (involving the automatic stay), § 502(b) (filing a proof of claim), and § 525 (protecting against discrimination).

section 101 provides some guidance on interpreting the term "instrumentality of the State", stating that:

> [Section 101(27)] defines "governmental unit" in the broadest sense. The definition encompasses the United States, a State, Commonwealth, District, Territory, municipality or foreign state, and a department, agency or instrumentality of any of those entities. "Department, agency, or instrumentality" does not include an entity that owes its existence to State action, such as the granting of a charter or license but that has no other connection with a State or a local government or the Federal Government. The relationship must be an active one in which the department, agency, or instrumentality is actually carrying out some governmental function.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 311 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 24 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5810, 6268. We can glean from this discussion that a legislative charter, a governmental purpose, and an active interaction between the entity and the State are some of the characteristics of a governmental unit.

■ From our review of the case law on the question, both in the bankruptcy area and in other contexts, we have formulated illustrative characteristics to guide the discussion of whether a particular entity is a governmental unit for section 523(a)(7) purposes, as follows:

(1) *The creation of the entity.* Was it created pursuant to state statute? Was its creation the result of private individual interaction or by governmental action? Does the State officially recognize the existence and purpose of the entity?

(2) *The purpose of the entity.* Was the entity established for the benefit of the State? Does it perform a governmental function? Is it a non-profit organization?

(3) *The operation of the entity.* Does the State have control or veto power over all or a portion of the activities of the entity? Does the State control or participate in the selection of the governing body and members of the entity? Is the State notified of, or take part in any meetings of the entity? Is State approval required for the acceptance of articles of incorporation or bylaws or the appointment of any new officers or directors? Where does title to the operational premises of the entity vest?

(4) *The rights and liabilities of the entity.* Who is responsible for any debt incurred by the entity? Does the entity have the right to sue and to be sued? What is the entity's status for taxable purposes? Is the entity afforded governmental immunity in any manner?

(5) *The dissolution of the entity.* Does the State have absolute or conditional authority to dissolve the entity? Who receives the entity's assets upon dissolution? Can the entity declare bankruptcy?

*See e.g., In re Greene County Hospital,* 59 B.R. 388, 389 (S.D.Miss.1986) (in the context of § 109(c), the test is whether the agency is subject to control by the state); *In re Wade,* 948 F.2d 1122 (9th Cir.1991) (in the context of § 362(b)(4), the court looks to the status, structure, and function of the entity); *In re County of Orange,* 183 B.R. 594, 600 (Bankr. C.D.Cal.1995) (under § 109, an instrumentality is "something by which an end is achieved"); *In re Williams,* 158 B.R. 488, 490 (Bankr.D.Id.1993) (under § 523(a)(7) court should look to function of the entity). *See also Kovats v. Rutgers,* 822 F.2d 1303 (3d Cir.1987) (discussing criteria for determining whether Rutgers was an agency of the State for Eleventh Amendment immunity purposes); *Krebs v. Rutgers,* 797 F.Supp. 1246, 1254 (D.N.J.1992) (discussing various factors in evaluating whether Rutgers, the State University was a state agency for Privacy Act purposes).[7]

■ A coincidence of characteristics of both the JUA and the MTF favors designation of both entities as instrumentalities of the State. Both entities are statutorily created for the purpose of insuring high-risk

7. For an explanation of similar factors used in the context of other areas of law, see for example: JOSEPH C. LONG, *Blue Sky Law,* "Chapter 4 Securities Exemptions" § 4.04 at *5–8 (1993); BRUCE D. SENZEL, "Unique Aspects and Concerns Pertinent to Investments of Governmental Plans of States and Their Political Subdivisions," 311 *PLI/Tax* 197 (1991).

drivers at market rates and reducing insurance costs for other New Jersey motorists. All insurers authorized to transact automobile insurance in New Jersey were required to be a member of each respective entity when it was created. N.J.S.A. 17:30E–4 and N.J.S.A. 17:33B–11. The JUA was established as a non-profit organization. N.J.S.A. 17:30E–4. As to MTF, the statute originally contemplated that the member insurers would share in the profits and losses of the MTF, as determined by the Commissioner of Insurance. N.J.S.A. 17:33B–11. Ultimately, the MTF incurred substantial losses, which has been the subject of recent legislation and will be borne partially from surcharge proceeds and partially from the insurance industry. *See supra* n. 5.

Operationally, the JUA Board of Directors is comprised of five gubernatorial appointments, no more than three of which may be from the same political party, one appointment by the Speaker of the General Assembly, one appointed by the President of the Senate, the Director of the DMV and the Commissioner of Insurance, or their designees, as ex officio members. N.J.S.A. 17:30E–5.[8] The board members are not compensated for their services, other than for reasonable and necessary expenses. N.J.S.A. 17:30E–5. The board meets at least annually with written notice of each meeting provided to the Commissioner and the appropriate supervisory Senate committees. *Id.* The JUA's plan of operation is subject to review and approval by the Commissioner. N.J.S.A. 17:30E–6.[9]

As to the operations of the MTF, the Commissioner is in direct control of the operations of the MTF. N.J.S.A. 17:33B–11. He is "in effect, the chief executive officer of the State's largest automobile-insurance company." *In re Commissioner of Insurance,* 132 N.J. 209, at 224, 624 A.2d 565 (1993). The Commissioner must promulgate a plan of operation, in consultation with a Market Transition Facility Advisory Board, which he appoints. *Id.*

As to the rights and liabilities of the two entities, the JUA has the power to enter into its own contracts, and can sue or be sued. N.J.S.A. 17:30E–7(a) and (b). A judgment against the JUA does not create any "direct liability against the servicing carrier, board of directors or the individual members, or the individual participating members of the association." N.J.S.A. 17:30E–7b. All of the claims and liabilities of the JUA are the responsibility of the JUA. The JUA and the MTF were granted immunity from liability for election of the level of coverage by the insured as long as the minimum amount required by law is provided, pursuant to N.J.S.A. 17:28–1.9, as enacted by L.1993, c. 156, § 1, effective June 29, 1993. This statute has been given retroactive effect. *Strube v. Travelers Indemn. Co. of Illinois,* 277 N.J.Super. 236, 649 A.2d 624 (App.Div.1994).

In terms of dissolution of the JUA and the MTF, both entities have been terminated operationally by statute. N.J.S.A. 17:33B–11(c). All that remains is the satisfaction of outstanding JUA and MTF obligations.

By way of summary, both the JUA and the MTF were created by the legislature, for governmental purposes serving the public interest. Both entities have been funded primarily by government imposed surcharges. With respect to both entities, membership by insurers is mandated by the government as a condition of doing business as an insurer in the State of New Jersey. The operations of both entities have been largely controlled by

---

**8.** Prior to 1988, N.J.S.A. 17:30E–5 provided for a seventeen member board, a majority of which represented the insurance companies and insurance producers. Senate Labor, Industry and Professions Committee Statement Assembly, No. 1696—L.1983, c. 65. The appointments were allocated as fourteen by the Governor (eight members to be automobile insurers, three to be insurance agents or brokers, and three to be public members), one by the Speaker of the General Assembly, and one by the President of the Senate. The Director of the Division of Motor Vehicles was an ex officio member. This statute was amended by L.1988, c. 119, § 17, effective January 1, 1989 to reconstitute the makeup of the board by reducing its size by half, and by reducing the number of members who are associated with particular insurance companies and producers.

**9.** A copy of the plan of operation is sent to the Senate and the General Assembly to allow them to monitor and evaluate the effectiveness of the act in general. N.J.S.A. 17:30E–19.

the government, and there is no private liability on the part of the individual insurers who are members of the entities. We readily conclude that both the JUA and the MTF constitute "governmental units" within the meaning of § 523(a)(7).

While the determination of whether the JUA or the MTF is a governmental unit is a federal question, "local law and decisions defining the status and nature of the agency involved in its relation to the sovereign are factors to be considered." *Urbano v. Board of Managers,* 415 F.2d 247, 250–51 (3d Cir. 1969), *cert. denied,* 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 129 (1970). Our conclusion that the JUA qualifies as a governmental unit is supported by the characterization of the JUA by the New Jersey Superior Court, Appellate Division, as "an instrumentality of the State." *In re the Order of the Commissioner of Insur. Deferring Certain Claim Payments by the NJ JUA,* 256 N.J.Super. 553, 562, 607 A.2d 992 (App.Div.1992) (addressing the impact of the Administrative Procedure Act upon the implementation of the JUA's plan of operation), *See also Strube v. Travelers Indemnity Co.,* 277 N.J.Super. 236, 239, 649 A.2d 624 (App.Div.1994) (referring to both the JUA and the MTF as agencies and noting that they enjoy limited immunity under N.J.S.A. 17:28–1.9).

With all § 523(a)(7) elements established, we conclude that debtor's obligation to repay motor vehicle surcharges, net of administrative expenses of collection charged by the DMV, are non-dischargeable. In light of our determination, we need not take up the issues raised regarding 11 U.S.C. § 523(a)(1).

Counsel for the Division of Motor Vehicles shall submit an order in conformance herewith.