

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-25-1997

# In Re: Professional Ins Mgmt

Precedential or Non-Precedential:

Docket
96-5447,96-5516

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

## Recommended Citation

"In Re: Professional Ins Mgmt" (1997). *1997 Decisions*. Paper 266.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/266

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 25, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 96-5447 and 96-5516

IN RE PROFESSIONAL INSURANCE MANAGEMENT,
        Debtor

THE OHIO CASUALTY GROUP OF INSURANCE
COMPANIES; THE OHIO CASUALTY INSURANCE
COMPANY; WEST AMERICAN INSURANCE COMPANY;
AMERICAN FIRE & CASUALTY COMPANY; THE OHIO
LIFE INSURANCE COMPANY; OHIO SECURITY
INSURANCE COMPANY; OCASCO BUDGET,
        Appellants at No. 96-5516

v.

PROFESSIONAL INSURANCE MANAGEMENT,
        Appellant at No. 96-5447

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 96-cv-02499)

Argued June 5, 1997

Before: BECKER and SCIRICA, Circuit Judges
and KELLY, District Judge*

(Filed November 25, 1997)

_____
*The Honorable James McGirr Kelly, United States District Judge for
the Eastern District of Pennsylvania, sitting by designation.


        SAMUEL MANDEL, ESQUIRE
         (ARGUED)
        136 West Route 38
        Moorestown, New Jersey 08057-3223

        MICHAEL A. ZINDLER, ESQUIRE
        Markowitz & Zindler
        3131 Princeton Pike
        Lawrenceville, New Jersey 08648

        Attorneys for Appellant/Cross-
        Appellee, Professional Insurance

Management

CHARLES X. GORMALLY,
 ESQUIRE (ARGUED)
CARL J. SORANNO, ESQUIRE
Brach Eichler Rosenberg Silver
Bernstein Hammer Gladstone
101 Eisenhower Parkway
Roseland, New Jersey 07068

Attorneys for Appellees/Cross-
Appellants, The Ohio Casualty
Group of Insurance Companies,
The Ohio Casualty Insurance
Company, West American
Insurance Company, American
Fire & Casualty Company, The
Ohio Life Insurance Company,
Ohio Security Insurance Company,
Ocasco Budget

OPINION OF THE COURT

SCIRICA, Circuit Judge.

In this appeal we must decide two questions affecting New Jersey automobile insurance policies: first, whether under the state's "two-for-one" insurance policy non-renewal rule,[1] an insurance carrier may apply its entire

_____

1. N.J. Stat. Ann. S 17:29C-7.1(c) (West 1994) provides: "For every two newly insured automobiles which an insurer voluntarily writes in each

2

quota of "two-for-one" credits to decline to renew the personal automobile insurance policies sold by one of its former agents; second, whether the insurance carrier here has a perfected security interest in its former agent's post-bankruptcy policy renewal commissions.

The district court held the insurance carrier could gradually terminate the agent's personal automobile policies under the "two-for-one rule" without violating New Jersey law. The district court also held the insurance carrier did not have a perfected security interest in its former agent's post-bankruptcy renewal commissions. In re Professional Ins. Management, No. 96-2499 (D.N.J. July 8, 1996). We will affirm.

I.

Professional Insurance Management ("PIM") is a New Jersey-licensed insurance broker and agent. In 1980, PIM became an agent for The Ohio Casualty Group of Insurance Companies ("Ohio Casualty"). Under the Ohio Casualty-PIM agency contract, PIM was authorized to market Ohio Casualty's personal and commercial insurance policies. PIM located customers, ascertained their insurance needs, and sold them appropriate Ohio Casualty policies. For personal automobile insurance policies, Ohio Casualty collected premiums directly from policyholders and sent PIM its sales commissions. For other types of insurance, PIM collected the premiums and forwarded them to Ohio Casualty, minus its earned sales commissions. Under the agency contract, Ohio Casualty could withhold PIM's commissions on personal automobile insurance policies to satisfy PIM's debt. Also, Ohio Casualty could terminate the contract on ninety days' notice.

In the early 1990s, PIM experienced serious business difficulties and, as a result, owed Ohio Casualty $252,642

_____

territory during each calendar year period, the insurer shall be permitted to refuse to renew one additional policy of automobile insurance in that territory in excess of the 2% limitation established in subsection b. of this section, subject to a fair and nondiscriminatory formula developed by rule or regulation of the commissioner . . . ."

3

in unpaid premiums. In March 1994, Ohio Casualty terminated its relationship with PIM. Later that year, PIM filed for bankruptcy. This appeal arises out of PIM's bankruptcy proceedings.

The first issue on appeal is whether Ohio Casualty could decline to renew the policies of PIM's personal automobile insurance customers. After PIM declared bankruptcy, Ohio Casualty declined to renew 65 of the 69 automobile insurance policies sold by PIM and scheduled to expire between June 17 and June 30, 1996. PIM claimed that Ohio Casualty impermissibly targeted these policies for non-renewal following the termination of the agency agreement between Ohio Casualy and PIM.2  Ohio Casualty maintained that it was permitted to do so under N.J. Stat. Ann. S 17:29C-7.1(c) (West 1994), New Jersey's"two-for-one rule," which allows an insurer to decline to renew one personal automobile insurance policy for every two new policies it writes. This action, if followed, would substantially reduce PIM's income by eliminating its renewal commissions.3

PIM sought an injunction from the bankruptcy court to require Ohio Casualty to rescind its non-renewal notices and to renew PIM policies that came due. PIM contended that Ohio Casualty's actions would "destroy" its personal automobile insurance business since all of its policyholders were up for renewal in the six months commencing October 1, 1996. PIM argued that Ohio Casualty's conduct was unfair and discriminatory, and violated New Jersey insurance law. The bankruptcy court agreed and granted the injunction. In re Professional Ins. Management, No. 94-

_____

2. PIM attributes a number of different motives to Ohio Casualty. At various points in its brief, PIM asserts that Ohio Casualty targeted its policies because the agency agreement had been terminated, because Ohio Casualty believed PIM had a high loss ratio, because PIM declined to limit the number of Ohio Casualty policies it wrote, and because Ohio Casualty desired to withdraw from the business of writing personal automobile insurance policies in New Jersey.

3. Neither PIM nor Ohio Casualty provided us with information regarding the percentage of business or the value of commissions PIM lost as a result of Ohio Casualty's practices. Therefore, we cannot ascertain the extent of economic damage PIM suffered because of Ohio's conduct.

4

13602 (Bankr. D.N.J. Apr. 19, 1996). On appeal, the United States District Court for the District of New Jersey reversed, holding that Ohio Casualty's decision to target PIM policies for non-renewal did not violate New Jersey law. In re Professional Ins. Management, No. 96-2499 (D.N.J. July 8, 1996).

The second issue on appeal is whether Ohio Casualty has a perfected security interest in PIM's post-bankruptcy renewal commissions. Ohio Casualty claims it does. The bankruptcy court held that PIM, not Ohio Casualty, retained the right to receive PIM renewal commissions because Ohio Casualty did not perfect its security interest in PIM's book of business. The district court affirmed the bankruptcy court's order, adopting the bankruptcy court's reasoning. Id. This appeal and cross-appeal followed.

II.

The district court had jurisdiction under 28 U.S.C. S 158(a)(3) (1988). We have jurisdiction under 28 U.S.C. S 158(d) (1988). In our review of bankruptcy court judgments, we, like the district court, apply the clearly erroneous standard to factual issues and exercise plenary

review over legal issues. In re Fegeley, 118 F.3d 979, 982 (3d Cir. 1997). Our review of the district court's interpretation and application of state law is plenary. Infocomp, Inc. v. Electra Products, Inc., 109 F.3d 902, 905 (3d Cir. 1997); Salve Regina College v. Russell , 499 U.S. 225, 231 (1991). In interpreting state law, we must predict how the highest court of that state would decide the relevant legal issues. Koppers Co. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1445 (3d Cir. 1996).

III.

A.

"For years, New Jersey's system of automobile insurance regulation, like those of many other states, has faced an intractable problem of providing coverage for high-risk drivers." State Farm Mut. Ins. Co. v. State , 590 A.2d 191,

195 (N.J. 1991). Because this appeal involves an interpretation of New Jersey's most recent legislative attempt to solve this problem, we will begin by briefly reviewing the recent history of New Jersey automobile insurance law.

In 1983, New Jersey instituted a state-sponsored automobile insurance fund, the Joint Underwriting Association, to provide high risk drivers with "coverage at rates equivalent to those charged in the voluntary market." Id. at 195. The Joint Underwriting Association selected insurance carriers to collect premiums, arrange coverage, and administer JUA insurance policies. In addition to normal premium income, the JUA received funding from Department of Motor Vehicles surcharges for moving violations and drunken driving convictions, as well as flat charges and residual market-equalization charges imposed on voluntary-market insureds. Thus, under the JUA, the general population of motorists partially subsidized the insurance costs of high-risk drivers. Id. at 196.

The Joint Underwriting Association was a failure. It lost money because collected premiums and additional funding were not sufficient to meet the amount of claims against JUA policies. In addition, the insurance industry began to refuse to insure anyone except the safest risks. Many safe drivers were forced to obtain JUA insurance. As a result, by 1988, over 50% of New Jersey's drivers, including many who had never had an accident or serious traffic violation, had to be insured through the JUA. Id.

In 1988, the legislature attempted to modify the JUA insurance system by "depopulating" the state pool to include only the highest risk drivers. Matter of Aetna Cas. and Sur. Co., 591 A.2d 631, 635 (N.J. Super. 1991), certif. denied, 599 A.2d 162 (N.J. 1991), cert. denied, 502 U.S. 1121 (1992). As a result, by 1992, the JUA covered only 20% of New Jersey's automobile insureds. Despite this change, the JUA still operated at a deficit. See Governor's Reconsideration and Recommendation Statement, N.J. Stat. Ann. S 17:28-1.4 (West 1994) ("The ever-increasing costs of our out-of-balance insurance system, coupled with the artificially low rates maintained for even the bad drivers in the JUA, has caused a deficit of approximately $2.5 billion

in the JUA and cash flow problems which have reached a critical point.").

In 1992, the New Jersey legislature adopted the Fair Automobile Insurance Reform Act ("FAIRA"), which replaced the JUA with mandatory private-sector insurance. See Fair Automobile Insurance Reform Act of 1990, N.J. Stat. Ann. S 17:33B-1 et seq. (West 1994). Under FAIRA, insurance companies conducting business in New Jersey are required to insure New Jersey drivers who had previously been insured through the JUA. As FAIRA's "take all comers" rule stipulates: "No insurer shall refuse to insure, refuse to renew, or limit coverage available for automobile insurance to an eligible person who meets its underwriting rules as filed with and approved by the commissioner in accordance with the provisions of section 7 of P.L.1988, c. 156 (C.17:29A-46)." N.J. Stat. Ann. S 17:33B-15 (West 1994).

FAIRA also requires insurance companies to renew their automobile insurance policies. N.J. Stat. Ann. S 39:6A-3 (West 1994) ("No licensed insurance carrier shall refuse to renew the required coverage stipulated by this act of an eligible person as defined in section 25 of P.L.1990, c.8 (C. 17:33B-13) except in accordance with the provisions of . . . 17:29C-7.1 or with the consent of the Commissioner of Insurance."). The New Jersey legislature provided several important exceptions to this mandatory renewal obligation. One exception, the "two-for-one rule," is the subject of this appeal. The "two-for-one rule" provides that an insurer may decline to renew one personal automobile policy for every two new policies it writes in a specific geographic area. N.J. Stat. Ann. S 17:29C-7.1(c) (West 1994). The rule also stipulates that an insurer's non-renewal policy must comply with the "fair and nondiscriminatory formula" developed by the Commissioner of Insurance. Id.

Ohio Casualty employed the "two-for-one" non-renewal exception to terminate 65 of the 69 personal automobile insurance policies sold by PIM and scheduled to expire between June 17 and June 30, 1996. PIM contends this treatment violates the requirement that the rule be employed in a "fair and nondiscriminatory" fashion.

As the district court noted, the Commissioner of Insurance has promulgated a discrimination formula under

N.J. Stat. Ann. S 17:29C-7.1(c). N.J. Admin. Code S 11:3-8.5(c) (1995) provides: "Nothing in [the "two-for-one rule"] shall be construed to authorize insurers to act in contravention of any applicable State or Federal law prohibiting discrimination on impermissible bases." PIM has not alleged that Ohio Casualty's conduct violates federal or state anti-discrimination laws. Nor are we aware of any facts suggesting that Ohio Casualty has done so.

B.

PIM contends that under N.J. Stat. Ann. S 17:22-6.14a(l) (West 1994) the New Jersey legislature intended to provide terminated agents with protection from targeted non-renewal. N.J. Stat. Ann. S 17:22-6.14a(l) provides, in part:

> [N]o insurance company which has terminated its contractual relationship with an agent . . . shall, upon the expiration of any automobile insurance policy . . . which is required to be renewed pursuant to . . . C.39:6A-3, refuse to renew . . . or refuse to service a policyholder . . . upon the written request of the agent . . . . The company shall pay a terminated agent who continues to service policies pursuant to the provisions of this subsection a commission in an amount not less than that provided for under the agency contract in effect at the time the notice of termination was issued. . . .

But the plain language of the entire statutory section undermines PIM's argument. The statute explicitly permits non-renewal under the "two-for-one rule." N.J. Stat. Ann. S 17:22-6.14a provides:

> However, nothing in this section shall be deemed to prevent nonrenewal of an automobile insurance policy pursuant to the provisions of section 26 of P.L. 1988, c.119 (C.17:29C7.1).").4

_____

4. The New Jersey Appellate Court reached a similar conclusion when it considered the targeting of agents under N.J.S.A. 17:29C-7.1(b)--the "2%" rule--which is another exception to New Jersey's requirement of mandatory renewal. This section provides:

8

There is nothing in the language of this section that insulates former agents from the "two-for-one" rule.

Nor does PIM cite anything in the legislative history to support its interpretation. PIM argues that the"legislative and judicial history of insurance law demonstrates a strong public interest in protecting" insurance agents. But PIM points to nothing specific in the legislative history to support its position and instead cites "obvious public policy," other statutory provisions that protect insurance agents, and pending legislation that would amend the"two-for-one" rule. But as Ohio Casualty points out, the New Jersey Legislature gave insurers the "two-for-one" credits "[i]n order to encourage depopulation of the JUA and expansion of the voluntary market." Senate Committee Statement to Senate, S. 202-2637 (N.J. 1988). See also Reconsideration and Recommendation Statement of Governor

_____

> For each calendar year period, an insurer may issue notices of intention not to renew an automobile insurance policy in the voluntary market in an amount not to exceed 2% of the total number of voluntary market automobile insurance policies of the insurer...which are in force at the end of the previous calendar year
> in each of the insurer's rating territories in use in this State. Id.

In Mary R. Barry & Inland Agency, Inc. v. Selective Ins. Group, Inc., Appellate Division No. A-3544-94T2 (May 14, 1996), the insurance company had applied the "2%" rule to eliminate 209 out of 465 personal automobile policies written by a terminated agent. The terminated agent complained that an insurance company should not be able to target a terminated agent under the "2%" rule. Citing N.J.S.A. 17:22-6.14(a) ("[N]othing in this section shall be deemed to prevent non-renewal of an automobile insurance policy pursuant to the provisions of section 26 of P.L. 1988, c.119 (C.17:29C7.1)"), the court found that the insurance company's decision to target the agent's policies for non-renewal did not violate New Jersey law.

Barry may be distinguished, however, because unlike the 2-for-1 rule, the New Jersey legislature has not made the "2%" rule subject to the "fair and nondiscriminatory formula." Nonetheless, the court's opinion is instructive because in interpreting this exception to the requirement of mandatory renewal, the court gave effect to the plain meaning of the

statute.

Kean, N.J. Stat. Ann. S 17:28-1.4 (stating that he agreed to "two-for-one" rule "[i]n the spirit of compromise").

Regardless of the purported intent of the legislature, and it appears to support Ohio Casualty's position, we are not free to ignore the plain and unambiguous language of the statute. Friedrich v. United States Computer Services, 974 F.2d 409, 419 (3d Cir. 1992) ("Although a statute should be interpreted in a fashion that does not defeat the congressional purpose . . . a court may not rewrite an unambiguous law.") (citations omitted). Until such time as the New Jersey Legislature decides to alter implementation of the "two-for-one" rule, we must interpret the statuory scheme as written. See In re Barshak, 106 F.3d 501, 506 (3d Cir. 1997).

C.

As in many states, New Jersey has established a complex regulatory scheme for the administration of personal automobile insurance. PIM contends the district court erred because "the formula contemplated by the Legislature is clearly something other than the nondiscrimination regulation as promulgated by the Commissioner." (Appellant Brief at 48). But PIM cites no authority for this claim. Instead, it relies upon the 1967 edition of the Random House Dictionary of the English Language, which, according to PIM, defines "formula" as "a set of words, as for stating something or declaring something definitely or authoritatively, for indicating procedure to be followed, or for prescribed use on some ceremonial occasion." (Appellant Brief at 49). PIM asserts that the Commissioner's anti-discrimination regulation, N.J. Admin. Code S 11:3-8.5(c), "does not fit this definition at all," because "[i]t does not set up any type of procedure for non-renewal and is therefore not a reasonable interpretation of the statutory requirement for a formula." Id. PIM suggests that because the Commissioner has not provided an adequate formula, the courts should do so.

But the New Jersey legislature specifically directed the Commissioner of Insurance to promulgate a fairness formula. N.J. Stat. Ann. S 17:29C-7.1(c) ("[The `two-for-one'

rule is] subject to a fair and nondiscriminatory formula developed by rule or regulation of the commissioner."). The Commissioner promulgated N.J. Admin. Code S 11:3-8.5(c), which prohibits insurers from acting "in contravention of any applicable State or Federal law prohibiting discrimination." Apparently, the Commissioner has declined to forbid the use of the "two-for-one" rule against a terminated agent's book of business. As the district court stated, "[i]t is not for this court to decide that the Commissioner did not go far enough" when it declined to provide protections against discrimination in addition to those currently available under state and federal law.

Those who are charged with the adoption and administration of New Jersey's automobile insurance laws are aware of the problems highlighted by this litigation, yet they have not decided to change the current scheme. Since passage of the "two-for-one" rule, the New Jersey legislature has considered and rejected proposed changes to New Jersey's insurance laws that would provide insurance agents with the protections PIM seeks here.5 That legislation has been introduced seeking to eliminate the precise conduct objected to by PIM is an indication that these "protections" are not currently available under New Jersey law. See Mary R. Barry & Inland Agency, Inc. v. Selective Ins. Group, Inc., Appellate Division No. A-3544-94T2, slip op. at 9 (May 14, 1996) ("Since the proposed bill was intended to curtail this practice, it is reasonable to conclude that the practice does not contravene the current statutory scheme."). Nor has New Jersey's Commissioner of

_____

5. In 1993, the Legislature considered changes that would eliminate the "two-for-one" rule and the "2%" rule. S. Res. 2064, 207th Leg. (N.J. 1993) (reintroduced as S. Res. 158 on January 8, 1994). That bill was never reported from the Senate Committee. A similar bill--S. Res. 557, 210th Leg. (N.J. 1996)--was introduced on January 20, 1996. On June 20, 1996, the Senate Committee substituted a version of the Bill that did not completely eliminate the "two-for-one" and "2%" rules but instead provided that an insurance company could not nonrenew more than 10% of a particular agent's book of business in a given year. On November 25, 1996, however, the Senate substituted a different version of the bill. This version, which is currently pending before the Senate, would eliminate the "two-for-one" rule and the "2%" rule altogether.

Insurance promulgated a more stringent fairness formula. Revision or elimination of the "two-for-one" rule has been under consideration in the legislature and in the Department of Insurance. In the face of unambiguous statutory language, efforts to change the law should be

directed there.

For these reasons, we agree with the district court that Ohio Casualty's use of its non-renewal credits on policies sold by PIM did not violate New Jersey insurance law.

IV.

For personal automobile insurance policies, Ohio Casualty collected premiums from PIM's customers and then sent PIM its sales commissions. During the course of the 1990's, PIM fell into debt, owing Ohio Casualty $252,642.40. Under the agency agreement, Ohio Casualty was entitled to retain PIM's commissions to offset PIM's debts. After PIM filed for bankruptcy, Ohio Casualty retained and used PIM's post-bankruptcy policy renewal commissions to offset PIM's debts. Ohio Casualty claims it has a right to retain these commissions because it has a perfected security interest in them. PIM maintains that Ohio Casualty has not perfected its interest because the post-bankruptcy renewal commissions are contract rights and therefore must be perfected by filing.[6]

The bankruptcy court held that Ohio Casualty did not have a perfected interest in the commissions because it did not have a perfected interest in PIM's book of business.[7] The bankruptcy court held:

> As a general matter, Ohio's collateral, in the agency agreement between the two parties, is the expirations,

_____

6. At oral argument, the parties agreed that for purposes of this cross-appeal we should assume that the 1980 agency agreement constitutes a security agreement. Furthermore, we only address the retention of commissions collected after PIM filed for bankruptcy.

7. An agent's book of business refers to the body of information developed and collected by the agent including a policyholder's name, address, policy type, date of expiration, policy number and other information pertinent to a customer's insurance needs.

12

> also known as the debtor's book of business. Expirations have been determined to be best categorized for UCC purposes as "general intangibles," which may be perfected only by filing, not by possession. In re Roy A. Dart Ins. Agency, Inc., 5 B.R. 207, 14-16 (Bank D. Mass. 1980). Possession of the commissions due to the agent does not act to perfect Ohio's security interest in debtor's expirations. Debtor's

> opportunity to collect commissions following the
> turnover of its Ohio book of business is not disturbed
> on this basis.

In re Professional Ins. Management, No. 94-13602, slip op. at 31 (Bankr. D.N.J. Apr. 19, 1996). The district court affirmed the bankruptcy court's ruling on this issue, adopting the bankruptcy court's reasoning without additional analysis. In re Professional Ins. Management, No. 96-2499, slip op. at 30 (D.N.J. July 8, 1996).8

Although we agree with the bankruptcy court's conclusion, our reasons to affirm the judgment are different. Under paragraph three of the agency agreement, Ohio Casualty's collateral interests in PIM's book of business and in PIM's commissions are separate and independent.9 The right to withhold commissions functions

_____

8. In analyzing whether PIM's interest is perfected, we look to New Jersey law. Although a federal statute, 11 U.S.C. S 552(b)(1) (1988), protects a creditor's pre-petition perfected security interest, the determination of whether PIM's security interest is perfected is a matter of state law. Pearson v. Salina Coffee House, Inc., 831 F.2d 1531, 1533 (10th Cir. 1987), (citing In re Chaseley's Foods, Inc., 726 F.2d 303, 307 (7th Cir. 1983); Havee v. Belk, 775 F.2d 1209, 1218-19 (4th Cir. 1985); In re Diamond 196 B.R. 635 (S.D. Fla. 1996)); see also Butner v. United States, 440 U.S. 48, 55 (1979) (noting that state law governing perfection of security interests applies "unless some federal interest requires a different result").

9. The agency agreement provides, in part: "3. The Agent's records and use and control of expirations shall remain the Agent's absolute property and be left in his undisputed possession; provided, however, in the event of termination of this agreement, if the Agent has not properly accounted for and paid all premiums for which he is liable, the Agent's records as respects business placed with the Company shall become the property of the Company and the Company shall have sole right to use and control

13

as additional security over and above the right to assign, sell, or transfer PIM's book of business. For that reason, the perfection status of Ohio Casualty's interest in PIM's book of business does not determine its rights to PIM's post-bankruptcy commissions. Instead, each source of collateral must be analyzed separately. Although the district court and bankruptcy court failed to conduct this analysis, we will affirm, because Ohio Casualty does not have a perfected security interest in the retained commissions.

When a debtor enters bankruptcy, an unperfected

creditor's interest in collateral is subordinated to the rights
of the bankruptcy trustee. N.J. Stat. Ann. S 12A:9-301
(West 1994); 11 U.S.C. S 544(b) (1988). For that reason, in
order to hold a secured position vis-a-vis the bankruptcy
trustee, Ohio Casualty had to perfect its security interest in
PIM's commissions before PIM filed for bankruptcy. We do
not believe it did so.

As we have noted, Ohio Casualty maintained a security
interest in PIM's cash commissions independent from any
interests it possessed in PIM's book of business. Ohio
Casualty contends that it has a perfected interest in the
post-bankruptcy commissions under 11 U.S.C. S 552(b)(1),
which provides:

> if the debtor and an entity entered into a security
> agreement before the commencement of the case and if
> the security interest created by such security
> agreement extends to property of the debtor acquired
> before the commencement of the case and to proceeds,
> product, offspring, or profits of such property, then
> such security interest extends to such proceeds,

_____

such expirations to the extent of the Agent's total indebtedness to the
Company, unless the Agent provides other security acceptable to the
Company . . . The Company, in the exercise of the right reserved to it
above, may, at its option, retain all commissions which are payable or
which may become payable under contracts of insurance represented by
such expirations, or renewals, thereof, and apply same against the
amount of the Agent's indebtedness to the Company, or may sell, assign,
transfer or otherwise dispose of such expirations to any other agent or
broker . . . ."

14

> product, offspring, or profits acquired by the estate
> after the commencement of the case to the extent
> provided by such security agreement and by applicable
> nonbankruptcy law, except to any extent that the
> court, after notice and a hearing and based on the
> equities of the case, orders otherwise.

As the Supreme Court has noted: "Section 552(b) sets forth
an exception, allowing postpetition `proceeds, product,
offspring, rents, or profits' of the collateral to be covered
only if the security agreement expressly provides for an
interest in such property, and the interest has been
perfected under `applicable nonbankruptcy law.' " United
Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates,
Ltd., 484 U.S. 365, 374 (1987) (citations omitted); see also
2 Thomas M. Quinn, Quinn's Uniform Commercial Code

Commentary and Law Digest P 9-306 (2d ed. 1991) ("The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected . . . .") (quoting U.C.C. S 9-306). To prevail under S 552(b)(1), Ohio Casualty must establish that (a) the commissions in question are the proceeds of a PIM pre-bankruptcy asset and that (b) it had a perfected security interest in that collateral prior to bankruptcy.

Ohio Casualty contends that PIM's right to commissions for post-petition renewal of policies PIM sold prior to bankruptcy was a pre-petition asset, that Paragraph 3 of the Ohio Casualty-PIM agency agreement gave it a security interest in that asset, and that the commissions eventually generated after bankruptcy as policies were renewed were the proceeds of that asset. Even if this reasoning is correct -- a question on which we take no position -- Ohio Casualty's claim cannot prevail because it failed to perfect its interest in the claimed asset before PIM filed for bankruptcy.

We believe there are two ways to characterize Ohio Casualty's collateral. Ohio Casualty's security interest is either in the commissions themselves or in the right to acquire future commissions. Under either analysis, we find that Ohio Casualty did not have a perfected security interest prior to the initiation of the bankruptcy proceeding.

15

If Ohio Casualty's interest is in the cash commissions themselves, its security interest is perfected by possession, rather than by filing a financing statement with the Secretary of State. N.J. Stat. Ann. S 12A:9-304 (West 1994). But perfection of cash collateral dates from the moment the secured creditor takes possession of the funds. N.J. Stat. Ann. S 12A:9-305 (West 1994). Here, Ohio Casualty admittedly took possession of the post-petition commissions after PIM filed for bankruptcy. Therefore, its security interest was not perfected prior to the bankruptcy filing date and its interest is subordinate to that of the bankruptcy trustee. 2 Thomas M. Quinn, Quinn's Uniform Commercial Code Commentary and Law Digest P 9-306[A][5] (2d ed. 1991) ("The secured creditor's claim to the proceeds, if `unperfected,' is vulnerable in bankruptcy.").

Alternatively, if Ohio Casualty's security interest is in the right to future renewal commissions, its right to PIM's renewal commissions is contractual, flowing from the agency agreement. Under New Jersey law, contract rights are typically considered "general intangibles." See N.J. Stat. Ann. S 12A:9-106, comm. (West 1994) ("The term `general

intangible' brings under this Article miscellaneous types of contractual rights and other personal property which are used or may become customarily used as commercial security."). General intangibles, unlike cash, are perfected by filing a financing statement with New Jersey's Office of the Secretary of State. N.J. Stat. Ann. S 12A:9-302 (West 1994); N.J. Stat. Ann. S 12A:9-401 (West 1994). But Ohio Casualty failed to file a security interest. Because its contractual interest in PIM's future commissions was not perfected before bankruptcy, Ohio Casualty can not claim protection under 11 U.S.C. S 552(b)(1) with respect to any proceeds of that asset. See United Sav. Ass'n, 484 U.S. at 374.10

_____

10. At oral argument, Ohio Casualty contended that its interest was perfected because renewal is mandatory. This contention is meritless. As noted, renewal is not mandatory in New Jersey; insurance companies can decline to renew policies under the "two-for-one" and "2%" rules. Ohio Casualty's argument that its interest in the future commissions should be treated as a present possessory interest in money to be paid at a future date, and not a contractual right, is unconvincing.

16

The perfection rules were adopted by the drafters of Article Nine of the Uniform Commercial Code to provide potential creditors with adequate notice that certain assets of the debtor had already been pledged as collateral for previously acquired debt. They give creditors the means to identify the security status of the debtor's collateral prior to the provision of capital. 2 Thomas M. Quinn, Quinn's Uniform Commercial Code Commentary and Law Digest, 119-101[A][4][E] (2d ed. 1991) ("The parties to whom `perfection' does speak are the trustee in bankruptcy, creditors of the debtor who attach the collateral, later lenders who advance money against the same collateral, possible buyers of the collateral, and anyone else for that matter who deals with the collateral in some way . .. . It does so by requiring the creditor to publish his interest in the collateral in such way as to alert these concerned outsiders of that interest.").

Here, Ohio Casualty took no steps, like filing afinancing statement, to put potential PIM creditors on notice of its interests in PIM's future commissions. Were we to adopt Ohio Casualty's position, it would undercut the purpose of the perfection rules. That Ohio Casualty had a right to offset PIM's commissions against PIM's debts under its agency agreement is insufficient, by itself, to create a perfected security interest. Future creditors could not rely on that agreement to provide notice of Ohio Casualty's

claims since the future creditors were not privy to, nor had notice of, the contract.

Ohio Casualty was required to file a financing statement to perfect any security interest it possessed in pre-petition contractual rights to post-petition PIM commissions. It failed to do so. Therefore, we will affirm the district court's judgment that Ohio Casualty maintains an unperfected security interest in the commissions.

V.

For the foregoing reasons we will affirm the judgment of the district court.

17

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

18